# United States Court of Appeals for the Fifth Circuit

———————————

No. 22-30656

———————————

United States Court of Appeals
Fifth Circuit

**FILED**

April 25, 2025

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

LOUIS AGE, JR.; STANTON GUILLORY; LOUIS AGE, III; RONALD WILSON, JR.,

*Defendants—Appellants*.

———————————————————————

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:16-CR-32-2

———————————————————————

Before HIGGINBOTHAM, STEWART, and HAYNES, *Circuit Judges*.[*]

PATRICK E. HIGGINBOTHAM, *Circuit Judge*:

Defendants Louis Age Jr., Louis Age III, Stanton Guillory, and Ronald Wilson were convicted and each sentenced to terms of life imprisonment for their involvement in the murder-for-hire of Milton Womack, a federal witness in a healthcare fraud case. Defendants collectively raise ten issues on appeal. Finding no error of the district court, we AFFIRM.

———————————————

[*] Judge Haynes concurs in the judgment only.

No. 22-30656

## I.

## A.

The history of this case began with an earlier healthcare fraud case in the Middle District of Louisiana. In August 2011, a federal grand jury charged Louis Age Jr. ("Age Jr."), Ayanna Age ("Ayanna"), Milton Womack, and others with conspiracy to commit healthcare fraud, conspiracy to receive and pay healthcare kickbacks, and making false statements to receive payments from Medicare.

Age Jr. owned South Louisiana Home Healthcare Agency ("South Louisiana"). His daughter, Ayanna, helped him run the business. Though Age Jr.'s son, Louis Age III ("Age III"), did not work for the company, he was on the payroll. South Louisiana paid illegal kickbacks for patient referrals, and Womack was a recruiter who received illegal kickbacks. And in a separate venture, Womack and Age III burned down a New Orleans school owned by Age Jr. as part of an insurance fraud scheme.

### 1.

As Womack knew about the healthcare fraud at South Louisiana and the burning of the New Orleans school, Age Jr. became concerned about Womack's inclusion in the healthcare fraud indictment. So Age Jr. hired Hilliard Fazande to represent Womack in the healthcare fraud case. Through Fazande, Age Jr. gave Womack cash payments to "be quiet and to cooperate with Fazande and [Age Jr.]." Then in December 2011 and again in March 2012, Womack contacted defense attorney Michael Fiser because "he was not comfortable with his present attorney Mr. Fazande" and wanted his "own lawyer." Following a *Garcia*[1] hearing, the court appointed Fiser to

---

[1] *United States v. Garcia*, 517 F.2d 272 (5th Cir. 1975), *abrogated on other grounds by Flanagan v. United States*, 465 U.S. 259, 263 (1984). If a defendant chooses to proceed with

replace Fazande as Womack's attorney. Womack met with Fiser and told him that he wanted to speak to the Prosecution. Soon thereafter, Fiser negotiated a plea agreement for Womack. The district court set a rearraignment date, with an electronic notification sent to all parties involved—including Age Jr.—scheduling Womack's rearraignment for the following week.

As it became clear to Age Jr. that Womack might indeed become a government witness in the healthcare fraud case, he decided at a meeting with Ayanna and her then-husband, Kendrick Johnson, to kill Womack. Johnson, Age III, and Wilson, a friend of Age III, set out to find Womack's whereabouts in New Orleans, while Age III searched for a hired gun.

In July 2012, at a repass gathering in New Orleans, Age III, Wilson, and members of the Young Mafia Fellaz ("YMF") gang Stanton Guillory, Raheem Jackson and Brian Marigny were present. The YMF members knew Age III and Wilson through a New Orleans "chop shop" that sold stolen car parts and facilitated insurance fraud by intentionally wrecking cars and filing insurance claims. At the repass, Age III was overheard telling Wilson that "he got to kill some n*gg* he about to get ready to go to court." Age III was also seen conversing with Guillory. Following that conversation, Guillory told Jackson that Age III would pay Guillory $5,000 to murder Womack. Guillory did not have his own cell phone, so he added Age III's number to both Jackson's and Marigny's phones.

Guillory, Jackson, and Marigny then began searching for Womack in the Gentilly neighborhood of New Orleans, as Age III had told them Womack

---

representation by counsel who has a conflict of interest, a district court must conduct a "*Garcia*" hearing to ensure a valid waiver by the defendant of his Sixth Amendment right. *Garcia*, 517 F.2d at 278.

was staying there at Conteryl Nicholas's—his girlfriend—house. On July 27, 2012, after spotting Womack, Guillory and the other YMF members shot and killed him. Guillory used a Glock Model 23 firearm that he and Jackson had stolen, and a red Chevrolet Monte Carlo that they had carjacked, to commit the murder.

Age III, however, failed to pay Guillory the full $5,000. In the days after the murder, Guillory called Age III multiple times a day for the remainder of the money. On August 1, 2012, Guillory was arrested after a high-speed chase in the same red Monte Carlo used to murder Womack.

## 2.

At around the time that Womack was murdered, Ayanna retained bankruptcy attorney Sharry Sandler to represent her in the healthcare fraud case. During meetings involving Sandler, Ayanna, and other members of the defense team—including Fazande—Ayanna was pressured to lie. Sandler recommended that Ayanna plead guilty, Ayanna complied, and she began cooperating with the Prosecution in the healthcare fraud case.

Age Jr. learned of Ayanna's plea and cooperation with the Prosecution, and became "extremely upset" with her. Age III told Ayanna that she was "dead" to the family, and Johnson told her that she could not come back to the family house. And Age Jr. sued Ayanna to take back rental properties that he had given to her, and unsuccessfully tried to initiate a criminal case against her for embezzlement.

No. 22-30656

Ayanna testified against Age Jr. in the healthcare fraud case.[2] Age Jr. was convicted, and this Court affirmed his 2015 convictions.[3]

**B.**

In August 2017, a federal grand jury in the Eastern District of Louisiana returned an 11-count indictment charging Age Jr., Age III, Guillory, and Wilson with multiple counts of obstructing justice in the healthcare fraud case, including the murder of Womack.[4] In April 2022, a jury convicted the Defendants on all counts, but acquitted Age III of conspiracy to retaliate against Ayanna.

The district court sentenced each defendant to at least one term of life imprisonment. In October 2022, the Defendants timely appealed their convictions and sentences, raising ten issues. None persuade.

**II.**

We turn first to the sufficiency of the evidence supporting the convictions.[5]

---

[2] Because the first trial resulted in a mistrial, there were two trials in that case. Ayanna testified in both.

[3] *United States v. Age*, 614 F. App'x 141, 146 (5th Cir. 2015) (unpub.).

[4] The indictment also charged Johnson. He pleaded guilty in February 2022, and is not a party in this appeal.

[5] Age Jr. and Wilson do not raise sufficiency challenges in their briefs. Though the defendants have adopted each other's arguments under FED. R. APP. P. 28(i), sufficiency of the evidence challenges are fact-specific and thus cannot be adopted. *See United States v. Solis*, 299 F.3d 420, 444 n.70 (5th Cir. 2002). Age Jr.'s and Wilson's failures to brief sufficiency of the evidence means that they have waived the issue. *See also, United States v. Beaumont*, 972 F.2d 553, 563 (5th Cir. 1992) ("Failure of an appellant to properly argue or present issues in an appellate brief renders those issues abandoned."). Because Age III and Guillory challenge multiple convictions, we address the counts in groups based on the relevant underlying conduct.

No. 22-30656

## A.

This Court reviews preserved challenges to the sufficiency of the evidence *de novo*,[6] reviewing "the record to determine whether, considering the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[7] "The jury retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses."[8] And where Defendants fail to preserve their sufficiency of the evidence challenges, this Court reviews for plain error, that is "only if there is a '*manifest* miscarriage of justice[,]'"[9] which "exists only if the record is devoid of evidence pointing to guilt, or . . . because the evidence on a key element of the offense is so tenuous that a conviction would be shocking."[10]

## B.

A rational juror could find beyond a reasonable doubt that Age III joined a conspiracy to commit murder-for-hire (Count 1) and committed

---

[6] *United States v. Gibson*, 875 F.3d 179, 185 (5th Cir. 2017).

[7] *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc) (citation omitted).

[8] *Gibson*, 875 F.3d at 185 (cleaned up).

[9] *United States v. Delgado*, 672 F.3d 320, 331 (5th Cir. 2012) (en banc) (quoting *United States v. Pierre*, 958 F.2d 1304, 1311 (5th Cir. 1992) (en banc)) (emphasis in original). *See also,* FED. R. CRIM. P. 52(b).

[10] *United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007) (cleaned up).

No. 22-30656

murder-for-hire (Count 2).[11] As Age III did not challenge these counts at trial, this Court applies plain-error review.

**1.**

To prove a conspiracy to commit murder-for-hire, the prosecution must demonstrate: (1) an agreement by two or more persons to commit murder-for-hire; (2) the defendant's knowing and voluntary participation in the agreement; and (3) an overt act committed by any one of the conspirators in furtherance of the conspiratorial objective.[12] And for the substantive offense of murder-for-hire, the Prosecution must show that the defendant has: (1) used or caused another person to use any facility of interstate commerce; (2) "with intent that a murder be committed in violation of the laws of any State or the United States"; (3) "as consideration for the receipt of . . . anything of pecuniary value[.]"[13]

To prove the murder-for-hire conspiracy, the Prosecution presented multiple witnesses. Jackson testified that in mid-July 2012, Age III and Guillory negotiated the hit on Womack. Marigny testified that Age III and Guillory—following their initial conversation about the murder—spoke on the phone multiple times a day to coordinate the murder-for-hire, that Age III and Wilson showed Guillory and the other YMF members Nicholas' house on Verbena Street where Womack often stayed "a day or two" before the murder, and that Age III provided a description of Womack to Guillory.

---

[11] Count One charged Age III and Guillory with conspiracy to commit murder-for-hire in violation of 18 U.S.C. § 1958. Count Two charged Age III and Guillory with the substantive offense of murder-for-hire in violation of 18 U.S.C. §§ 1958, 2.

[12] *United States v. Walker*, 596 F. App'x 302, 309-10 (5th Cir. 2015) (unpub.). *See also* 18 U.S.C. § 1958.

[13] *Walker*, 596 F. App'x at 309.

No. 22-30656

Turning to the substantive offense, both Jackson and Marigny testified that they saw Guillory use the stolen Glock to murder Womack. Jackson added that Guillory and the YMF members were compensated with money and other benefits by Age III and Wilson while they were searching for Womack; that after the murder, Age III paid Guillory, albeit less than he had originally promised; and that Guillory attempted to call Age III "every day all day" to get the rest of the money. The Prosecution corroborated this evidence with a recorded jail cell phone conversation between Buddy Lewis—a YMF gang member—and Guillory, in which Lewis told Guillory that Age III owed Guillory money for the hit.[14]

**2.**

In sum, viewed in the light most favorable to the verdict, the trial evidence was adequate to prove beyond a reasonable doubt that Age III knowingly and voluntarily entered into a conspiracy to achieve the unlawful purpose of murdering Womack. Multiple witnesses testified to that effect, and the Prosecution provided circumstantial evidence to corroborate their testimony. There was no error.

**C.**

We turn next to Age III and Guillory's challenges to their convictions for conspiracy to tamper with a federal witness (Count Three),[15] and the

_____

[14] During the recorded jail cell telephone conversation, Lewis told Guillory: "Big Lou got to pay for that, man. Big Lou come and pay for that. I got his number". At trial, Lewis testified that in this phone call, he was referring to the "money Big Lou owes Nan . . . . [f]or the murder."

[15] Count Three charged Age III and Guillory with conspiracy to tamper with a federal witness through Womack's murder in violation of 18 U.S.C. §§ 1512(a)(1)(A), 1512(a)(3)(A) and 1512(k). The elements of a § 1512(k) conspiracy include: "(1) an agreement between the defendant and at least one other person to pursue the object of the conspiracy, (2) the defendant's knowledge of the unlawful purpose of the agreement, and

substantive offense of federal witness tampering (Count Four).[16] Age III also challenges his conviction for the substantive offense of witness tampering through Womack's murder to prevent his testimony related to the arson of a New Orleans school (Count Five). We find that the Prosecution gave the jury sufficient evidence to conclude beyond a reasonable doubt that Age III and Guillory unlawfully conspired to and committed witness tampering.

**1.**

The substantive offense of witness tampering criminalizes the act of killing or attempting to kill another person, with the intent to "prevent the attendance or testimony of any person in an official proceeding[,]"[17] or to "prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense[.]"[18]

The Prosecution relied on direct trial testimony to establish a murder-for-hire conspiracy among Age III, Guillory, and others to prevent Womack's testimony in the healthcare fraud case and the arson-related insurance fraud scheme. Ayanna testified that Age III assisted Womack with the arson of the school, and that Age Jr. had voiced concerns about Womack regarding "the arson and not just the recruiting of the patients[.]" Ayanna also stated that after Age Jr. learned of Womack's decision to plead in the healthcare fraud

---

(3) that an overt act was taken by one of the conspirators toward carrying out the object of the conspiracy." *United States v. Said*, No. 21-10588, 2023 WL 167213, at *3, *3 n.17 (5th Cir. Jan. 12, 2023) (unpub.).

[16] Count Four charged Age III and Guillory with the substantive offense of witness tampering through Womack's murder to prevent Womack's testimony in the healthcare fraud trial, in violation of 18 U.S.C. §§ 1512(a)(1)(A), 1512(a)(3)(A), and 2.

[17] 18 U.S.C. § 1512(a)(1)(A).

[18] *Id.* at § 1512(a)(1)(C).

case, the decision was made to kill Womack, and that soon thereafter, Johnson and Age III set out to find Womack.

Jackson provided testimony of Guillory's involvement in both the conspiracy and the substantive offense of witness tampering. He testified that following Age III and Guillory's conversation at the repass gathering, Guillory told Jackson that Age III wanted him "to kill somebody for him." Lewis' testimony provided additional support for Guillory's knowledge that Womack was a federal witness: he stated that when Guillory told Lewis that "he was going to take the hit" for Age III, Lewis cautioned him against killing a federal witness, but Guillory brushed Lewis' concerns off.

**2.**

As Guillory preserved his challenges to Counts Three and Four, we review his claims *de novo* and find sufficient evidence in the record to support the jury's verdict.[19] Testimony from the YMF members establish that Guillory knew Womack was a federal witness and plotted to kill Womack to prevent his testimony in the healthcare fraud trial.

We review Age III's claims as to Counts Three, Four and Five for plain error as he failed to preserve the claims at trial. Age III raises two arguments to support his challenge. Neither is convincing. First, Age III argues that his conviction under Count Three is invalid because the jury verdict failed to specify the basis for their conviction. The Prosecution's indictment charged defendants with conspiring to kill Womack under two theories of guilt: (1) to prevent Womack from testifying in the healthcare fraud trial, and (2) to prevent Womack from providing information related to

---

[19] *Gibson*, 875 F.3d at 185.

the arson to law enforcement officials. Age III argues that the jury should have been asked to make clear its theory of guilt.

This Court, however, has upheld the use of similar jury verdict forms in cases where the jury was given sufficient instructions to guard against a non-unanimous verdict.[20] The unanimity jury instructions here did not meaningfully differ from the instructions this Court has approved and are sufficient.[21]

Second, Age III argues that the Prosecution did not establish that Womack died. But this claim is undermined by a trove of evidence presented by the Prosecution at trial, including eyewitness testimony from Jackson and Marigny, and testimony from the Prosecution's lead homicide detective that he attended Womack's autopsy and observed that Womack had suffered gunshot wounds to the head and shoulders.

Under a plain-error standard of review, the evidence supporting Age III's convictions for Counts Three, Four, and Five were sufficient.

---

[20] *See, e.g.*, *United States v. Mauskar*, 557 F.3d 219, 226-27 (5th Cir. 2009).

[21] *Compare* the district court's unanimity instructions ("You will note that the indictment charges the defendants with conspiring to kill Womack with two different intentions. The Government does not have to prove both of these for you to return a guilty verdict on this count. Proof beyond a reasonable doubt on one is enough. But in order to return a guilty verdict, all of you must agree that the same one has been proved. All of you must be in agreement that the Government proved beyond a reasonable doubt that the defendants conspired to kill Womack with an intent to prevent Womack from attending or testifying in the healthcare fraud trial in the Middle District of Louisiana, or all of you must agree that the Government proved beyond a reasonable doubt that the defendants conspired to kill Womack to prevent Womack from communicating to law enforcement about the use of fire to commit mail fraud."), *with Mauskar*, 557 F.3d at 226-27.

No. 22-30656

**D.**

Age III and Guillory also challenge their convictions for conspiracy to commit witness retaliation (Count Six) and for the substantive offense of witness retaliation (Count Seven).[22]

**1.**

A defendant is guilty of retaliating against a witness if he "kills or attempts to kill another person with intent to retaliate against any person for . . . providing to a law enforcement officer any information relating to the commission or possible commission of a Federal offense[.]"[23] A defendant who conspires to commit the offense of retaliation "shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."[24] And, "under 18 U.S.C. § 1513, the Government need not establish an intent to carry out the threat; the only intent required is an intent to retaliate."[25]

Here, to establish context, the Prosecution brought evidence of tense conversations between Womack and Age Jr. regarding the healthcare fraud case. Fiser testified that following Womack's *Garcia* hearing, Womack told

---

[22] Count Six charged Age III and Guillory with the conspiracy to retaliate against Womack for providing information to a law enforcement officer, in violation of 18 U.S.C. §§ 1513(a)(1)(B), 1513(a)(2)(A), and 1513(f). Count Seven charged Age III and Guillory with substantive retaliation against Womack, in violation of 18 U.S.C. §§ 1513(a)(1)(B), 1513(a)(2)(A), and 2.

[23] 18 U.S.C. § 1513(a)(1)(B).

[24] *Id.* at § 1513(f).

[25] *United States v. Maggitt*, 784 F.2d 590, 593-94 (5th Cir. 1986) (citation omitted).

Fiser that he had a "very heated exchange" with Age Jr. Both Nicholas and Ayanna testified that they overheard phone conversations between Womack and Age Jr., including Womack telling Age Jr. that he was not going to take a "f'ing charge." Fiser and James Gray, Age Jr.'s attorney in the healthcare fraud case, also testified that Womack was murdered just two days after an electronic notification for his rearraignment was sent to all parties in the healthcare fraud case.

As for Age III and Guillory's involvement, the Prosecution relied on its evidence for Counts Three, Four, and Five as proof that Age III hired Guillory to kill Womack because Womack agreed to cooperate in the healthcare fraud case.

**2.**

As to Guillory's preserved claims under Counts Six and Seven, we are persuaded that there was sufficient evidence in the record to support the jury's verdict. That Womack was a federal witness and was allegedly murdered because of his decision to cooperate in the healthcare fraud case is sufficient evidence of retaliation; a reasonable juror could find that Guillory conspired to retaliate—and did retaliate—against Womack.

We also find no plain error in Age III's convictions.[26] The Prosecution provided sufficient evidence to prove that Age III hired and paid Guillory to kill Womack, and thus that Age III was a part of the conspiracy and substantive offense of witness retaliation against Womack.

---

[26] Age III failed to preserve his claims as to Counts Six and Seven at trial, and we review them for plain error. *Delgado*, 672 F.3d at 328.

No. 22-30656

**E.**

Age III challenges his conviction for witness tampering of Womack and Ayanna (Count Eight).[27] Count Eight targets obstructive conduct unrelated to Womack's murder, including cash payments and other benefits given to Womack to prevent him from testifying in the healthcare fraud case, as well as intimidating Ayanna.

**1.**

Turning first to Ayanna, the Prosecution presented evidence—via Ayanna's own testimony—of Age Jr.'s attempts to threaten and intimidate her when he discovered that she had agreed to cooperate against him in the healthcare fraud trial. Such obstructive conduct included Age Jr.'s forcing Ayanna and her daughters out of the Age family home in Slidell, Louisiana; Age Jr.'s lawsuit against Ayanna to take back rental properties that he had previously purchased in her name; and Age Jr.'s attempt to initiate a criminal case against her for embezzlement. Ayanna also testified as to Age III's participation, stating that after she pleaded guilty in the healthcare fraud case, Age III told her that she was "dead" to the family and that she was "nothing without [her] daddy." Ayanna further testified that Age III helped Age Jr. in taking back the rental properties by delivering documents that—if signed—would return custody of the rental properties to Age Jr.

As to Womack, the Prosecution provided evidence of Age Jr.'s payments to Womack through Fazande "to keep him . . . quiet." Ayanna testified that Age III received payments from South Louisiana, which were at

---

[27] Count Eight charged Age III with conspiracy to commit witness tampering as to Womack and Ayanna, in violation of 18 U.S.C. §§ 1512(b)(1), 1512(b)(3), and 1512(k).

issue in the healthcare fraud case, and that Age III had assisted Womack in burning the school.

**2.**

We review Age III's claims as to Ayanna *de novo* and affirm the jury's verdict.[28] Age III argues that "[m]erely telling someone that they are no longer in your life . . . is not evidence of retaliation[.]" We disagree. Given the context of Ayanna's "[a]lmost inseparable[,]" "[e]xtremely close" relationship with her father, a rational juror could infer that Age III's statement was a threat with the intent to influence Ayanna's decision to cooperate with the Prosecution.[29] And Age III's assertion that there was no specific testimony of his knowledge of the housing lawsuits or criminal charges against Ayanna is belied by her testimony that Age III hand-delivered documents related to the custody of the rental properties.

Reviewing Age III's claims regarding Womack for plain error,[30] we are not persuaded that the jury's verdict was a "*manifest* miscarriage of justice."[31] Given the evidence supporting Age III's involvement in Womack's murder and the circumstantial evidence establishing the threat that Womack's cooperation would have posed to Age III, a rational juror could have concluded that Age III knew and approved of Age Jr.'s payments to Womack through Fazande.

Age III next challenges his conviction under Count Eight, arguing that the verdict form failed to identify the specific intention the jury agreed upon.

---

[28] Age III preserved his Count Eight claims related to Ayanna at trial.

[29] *See Maggitt*, 784 F.2d at 594.

[30] As Age III did not preserve his Count Eight claims related to Womack at trial, we review for plain error. *Delgado*, 672 F.3d at 328.

[31] *Id.* at 331 (emphasis in original) (cleaned up).

No. 22-30656

Again, this claim is meritless: this Court has approved the use of identical unanimity instructions in other cases, finding them sufficient.[32]

### F.

Age III next challenges his conviction for making false statements to the FBI, in violation of 18 U.S.C. § 1001 (Count Eleven). As Age III did not preserve this claim at trial, we apply a plain error standard of review and find none.[33]

### 1.

"To sustain a conviction under § 1001, the government must prove that [the defendant] (1) made a statement (2) that was false (3) and material (4) knowingly and willfully and (5) that falls within agency jurisdiction."[34] "Statements are material within the meaning of § 1001 when they have the natural tendency or capacity to deceive, affect, or influence the federal agency."[35] "The standard is not whether the false statement actually influenced . . . or . . . probably influenced [a government] decision; the standard is whether the misrepresentation was *capable* of influencing the agency decision."[36]

The Prosecution relied on testimony from FBI case agent Chuck Williams, who interviewed Age III and testified that Age III told him that he did not recall his own cell phone number; recognize his grandfather's name;

---

[32] *See Mauskar*, 557 F.3d at 226-27.

[33] *Delgado*, 672 F.3d at 328.

[34] *United States v. Ricard*, 922 F.3d 639, 651 (5th Cir. 2019) (cleaned up).

[35] *United States v. Sidhu*, 130 F.3d 644, 650 (5th Cir. 1997) (cleaned up).

[36] *United States v. Richardson*, 676 F.3d 491, 505 (5th Cir. 2012) (emphasis in original) (cleaned up).

No. 22-30656

nor explain why the listing of his home address was on the billing records of his cell phone number.

**2.**

As with Counts Three and Eight, Age III argues that his conviction for Count Eleven should be vacated because "the verdict form did not make any additional findings as to which statement the jury agreed upon[.]" Age III's challenge here is unconvincing. This Court has upheld the use of similar jury verdict forms.[37] And he has failed to identify any evidence of confusion or disagreement within the jury regarding Count Eleven.[38]

He also argues that "the [G]overnment has not shown that the statements [he] allegedly gave were material" as law enforcement was already aware of the information. The standard for materiality, however, is broad: the false statements need not have influenced a government decision; they need only be capable of doing so.[39] Here they were, as they had the ability to deceive the Government.

**G.**

Age III and Guillory raise—and we reject—a final challenge to their various convictions, arguing that the Prosecution relied primarily on uncredible witnesses whose testimony was "not adequate and sufficient to support" their convictions. And, though Age III acknowledges that a co-

---

[37] *See United States v. Creech*, 408 F.3d 264, 268 (5th Cir. 2005).

[38] *See United States v. Tucker*, 345 F.3d 320, 336-37 (5th Cir. 2003) (finding no plain error where appellant "does not corroborate his claim of prejudicial error with a modicum of evidence tending to show that the jury was confused or possessed any difficulty reaching a unanimous verdict.").

[39] *See Richardson*, 676 F.3d at 505.

conspirator's uncorroborated testimony may sustain a conviction, he argues that the testimony at issue is "incredible."

"[A] guilty verdict may be sustained if supported only by the uncorroborated testimony of a co-conspirator . . . unless the testimony is incredible or insubstantial on its face."[40] "Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature."[41] The witness testimony here does not reach the threshold of "incredible": each of the witnesses had firsthand knowledge of Age III and Guillory's involvement in the conspiracy and murder-for-hire offense.[42] And "the jury decides credibility of witnesses, not the appellate court."[43] The district court provided special jury instructions on witness credibility, instructing the jury to weigh the testimony heard with "greater care and caution than the testimony of ordinary witnesses." The jury nevertheless convicted Age III and Guillory on these counts.

Age III also argues that the Prosecution failed to prove that he was part of any conspiracy. He asserts that his "association" with Age Jr.'s actions were due to family connections, and that the Prosecution failed to prove that Age III acted on his own volition. This argument also fails. The evidence presented by the Prosecution—including witness testimony and corroborating circumstantial evidence—shows that Age III played an active role in Womack's murder-for-hire and witness tampering of Ayanna.

---

[40] *United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994) (citations omitted).

[41] *Id.* (citations omitted).

[42] *Id.*

[43] *United States v. Kieffer*, 991 F.3d 630, 634 (5th Cir. 2021).

No. 22-30656

## III.

Defendants also challenge the admission of certain evidence at trial, asserting errors that require a new trial. We disagree.[44]

## A.

We note that: "[e]vidence of crimes, wrongs, and other bad acts is generally admissible if intrinsic to the crimes charged. Evidence is considered intrinsic if it is an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, if it was inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime of the trial."[45] And, "where a conspiracy is charged, acts that are not alleged in the indictment may be admissible as part of the Government's proof[,]"[46] such as "evidence of acts committed pursuant to a conspiracy and offered to prove the defendant's membership or participation in the conspiracy[.]"[47]

Under FED. R. EVID. 404(b), "evidence of a crime, wrong, or other act is not admissible to prove a person's character; however, such evidence may be admissible for another purpose, such as proving motive, opportunity,

---

[44] Defendants also argue that this Court should reconsider its jurisprudence on intrinsic evidence, and join sister circuits such as the D.C. Circuit, Third Circuit, and the Seventh Circuit in "abandoning or restricting" the definition of "intrinsic evidence". Because we find that this Court's jurisprudence on intrinsic and extrinsic evidence is clear in deciding the outcome here, we decline to consider this argument.

[45] *United States v. Gurrola*, 898 F.3d 524, 536 (5th Cir. 2018) (cleaned up).

[46] *United States v. Watkins*, 591 F.3d 780, 785 (5th Cir. 2009).

[47] *United States v. Garcia Abrego*, 141 F.3d 142, 175 (5th Cir. 1998) (cleaned up).

intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[48]

This Court applies a two-step test to determine admissibility under Rule 404(b): "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of [R]ule 403."[49] At this second step, this Court considers four factors: "(1) the government's need for the extrinsic evidence, (2) the similarity between the extrinsic and charged offenses, (3) the amount of time separating the two offenses, and (4) the court's limiting instructions."[50] Error under this standard is not reversible if it "would not have substantially influenced the jury's verdict[.]"[51]

**B.**

The Defendants challenge the admission of evidence regarding criminal activity committed by Guillory and other YMF members at times proximate to the time of Womack's murder. These acts include:

- Guillory's participation in a May 2012 drive-by shootout with a rival gang, which resulted in the murders of Shawanna Pierce and five-year-old Brianna Allen;
- Guillory's participation as a gang member in a June 2012 murder of rival gang member Jonathan "Kruger" Lewis;
- Guillory's participation in an armed robbery with the gun that he later used against Womack;

---

[48] *United States v. Juarez*, 866 F.3d 622, 626-27 (5th Cir. 2017) (cleaned up).

[49] *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (citation omitted).

[50] *United States v. Smith*, 804 F.3d 724, 736 (5th Cir. 2015) (cleaned up).

[51] *United States v. Flores*, 640 F.3d 638, 643 (5th Cir. 2011).

- Guillory's armed carjacking of the red Chevrolet Monte Carlo that he drove the night of Womack's murder;
- Guillory's participation in a July 2012 shootout wherein he fired the same gun he used to kill Womack;
- Guillory's participation in the shooting of a rival gang member that occurred sometime after but close in time to Womack's murder, wherein he used the same gun; and
- The YMF's general acts of violence.

### 1.

Defendants specifically argue that the district court erred in admitting evidence regarding the May 2012 and June 2012 murders as the Prosecution failed to prove that the evidence bore on why Guillory was hired for Womack's murder. Defendants assert that there was no evidence presented to suggest that Guillory's co-defendants hired him because of the murders.

Without deciding whether the evidence regarding Guillory's participation in the May 2012 murders and the June 2012 murder were intrinsic or extrinsic, we are persuaded that any error here was harmless. The evidence presented at trial, as we have recounted—even without the evidence of Guillory's May and June 2012 murders—was sufficient to convict the Defendants of all applicable counts. [52] In other words, the admitted evidence "would not have substantially influenced the jury's verdict[.]" [53]

### 2.

Defendants also challenge the district court's admission of evidence relating to Guillory's other gang-related criminal activity, arguing that such

---

[52] *See supra* II.

[53] *Flores*, 640 F.3d at 643.

evidence should have been characterized as extrinsic evidence, and the district court erred in deciding otherwise.[54] We find no error.

The evidence of Guillory's other criminal activity establishes his involvement and role in the murder-for-hire conspiracy. The evidence at issue provides necessary context in Guillory's obtaining the Glock Model 23 and red Chevrolet Monte Carlo he would use to kill Womack, and his continued control over the gun and the car after Womack's murder.[55] Furthermore, evidence of the YMF's general acts of gang violence explained why Age III and Wilson first approached the YMF for help with Womack's murder. This evidence served to "complete the story of the crime of the trial," and was properly admitted as intrinsic evidence.[56]

## C.

Next, three Defendants challenge the district court's admission of evidence regarding the fraudulent schemes committed by the Age family, including:

- Fraudulent insurance claims the Age family filed in 2005 after Womack and Age III burned the New Orleans school; and

- The Medicare fraud at South Louisiana.[57]

---

[54] Guillory's appellate briefs focus exclusively on the May 2012 and June 2012 murders.

[55] Indeed, though Wilson maintains that the evidence should have been classified as extrinsic, Wilson acknowledges that it "had some relevance to this prosecution."

[56] *Gurrola*, 898 F.3d at 536.

[57] Guillory does not raise this in his appellate brief, nor in his reply brief.

Defendants argue that evidence related to the fraud schemes were not intrinsic to the case at hand because "there was no immediate context of time and place."[58] We find to the contrary.

The district court correctly admitted the arson-related insurance fraud evidence as intrinsic to the charged offenses. In admitting the evidence, the district court explained that the "purpose of both the conspiracy directed toward Womack and the one directed toward Ayanna was to prevent their adverse testimony regarding the Defendants' past criminal acts, including [the] arson." We agree: the evidence proving that Womack and Age III burned down the school at Age Jr.'s instructions provides additional context, establishing groundwork for the conspiracy created.[59]

We also find that the district court correctly characterized the Medicare fraud evidence as intrinsic; it was a necessary preliminary to understand the current conspiracy charges.[60] As the district court observed:

> "Evidence of this fraud is inextricably intertwined with the charged conspiracies for, without the fraud, there would be no Medicare fraud prosecution, no fear on Defendants' part that their fraud or their prior criminal acts could be revealed in witness testimony, and thus no reason to silence cooperators Ayanna and Womack."

---

[58] Age Jr. asserts that such evidence must satisfy Rule 404(b) and "be subject to . . . an anti-propensity instruction." But because we find that the district court properly admitted the evidence as intrinsic, we decline to address this argument.

[59] Wilson argues that as to the arson-related insurance fraud, there was no evidence presented to suggest that he knew or participated in the fraud. We find, however, that even if there were no direct evidence presented, his participation in the conspiracy to murder Womack is enough for a reasonable juror to find that that he knew of the fraud.

[60] *See Gurrola*, 898 F.3d at 536.

No. 22-30656

Age Jr. asserts a distinct claim of error related to the Medicare fraud evidence, alleging that he was prejudiced by the district court's decision to allow the Prosecution to elicit testimony that Age Jr. had been convicted of the fraud during its cross-examination of Gray. Though the district court initially excluded evidence of Age Jr.'s Medicare fraud conviction, it allowed the Prosecution to bring it up during cross-examination on finding that Defendants had "opened the door" to the evidence. Age Jr. now argues that the district court's finding was arbitrary and unfair.

We disagree. "It is well-settled in this Circuit that a defendant may not complain on appeal he was prejudiced by evidence relating to a subject which he opened up at trial."[61] Statements elicited by defense counsel "open[] the door" if they convey an erroneous impression on the jury.[62] Gray's testimony—though not explicit—suggested Age Jr.'s innocence in the Medicare fraud case. The district court was correct to allow the Prosecution to ask about Age Jr.'s criminal conviction and to clarify any erroneous impression of Age Jr.'s innocence in the Medicare fraud case.[63]

## D.

Age III and Wilson raise additional challenges to the district court's admission of evidence related to:

---

[61] *United States v. Kiekow*, 872 F.3d 236, 252 (5th Cir. 2017) (cleaned up).

[62] *United States v. Plato*, 593 F. App'x 364, 374-75 (5th Cir. 2015) (per curiam).

[63] Wilson also asserts that the district court erred in admitting immeasurably prejudicial evidence as intrinsic against him without limiting instructions. Specifically, Wilson argues that of the aforementioned evidence—such as Guillory's bad acts and the Age family's various acts of frauds—many of them did not involve Wilson. But as discussed, much of this evidence was correctly admitted as intrinsic and therefore did not require limiting jury instructions. To the extent that there was error, any such error was harmless.

- The staged automobile collisions resulting in fraudulent insurance claims that Age III and Wilson participated in with others from the chop shop; and
- Wilson's drug-dealing, as described in the testimony of jailhouse informant Michael Crawford.

Age III argues that the district court erred in admitting evidence of staged automobile collisions as it was not necessary to prove Guillory's hire for Womack's murder. We disagree.

This Court has found evidence to be intrinsic when "it provide[s] background information necessary for a jury to understand the structure of . . . the conspiratorial relationship between [co-defendants], and how the conspiracy came about."[64] Here, testimony from Jackson and Lewis established that the chop shop served as a connection between the YMF, Age III, and Wilson. This evidence is intrinsic because it casts light on the relationship of Age III, Wilson, and the YMF gang, and how they came to know each other through the staged accidents and insurance claims—origins of the co-Defendants.

Wilson similarly argues that the district court erroneously admitted evidence related to his prior drug-dealing. He asserts that Crawford's testimony was not a "necessary predicate" of the conspiracies charged because there was no evidence to suggest that the drug dealing involved other Defendants or had temporal connectivity to the charges at hand. Though this may be true, we ultimately find that the admission of the evidence was in any

---

[64] *United States v. King*, 684 F. App'x 451, 456 (5th Cir. 2017) (per curiam). *See also United States v. Rice*, 607 F.3d 133, 141 (5th Cir. 2010).

No. 22-30656

event harmless, as the remaining evidence presented at trial was sufficient to convict him of all applicable counts.[65]

## IV.

The district court also properly admitted evidence of historical cell site location information ("CSLI") over Defendants' Fourth Amendment objections.

## A.

The Fourth Amendment "protects against government intrusion into areas where people have reasonable expectations of privacy[,]" and requires the prosecution to obtain a warrant supported by probable cause when it "seeks to intrude upon . . . private spheres."[66] Though the "Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands[,]" courts have created the exclusionary rule, "a judicially created remedy that precludes the use of evidence obtained from unconstitutional search or seizure[.]"[67]

"An exception to the exclusionary rule exists where government investigators acted with an objectively reasonable good-faith belief that their conduct was lawful."[68] Courts have applied the good-faith exception "to evidence obtained from *warrantless* searches later held to be unconstitutional."[69] Furthermore, the Supreme Court has held that the

---

[65] *See Rice*, 607 F.3d at 140-41.

[66] *United States v. Beverly*, 943 F.3d 225, 232 (5th Cir. 2019) (citations omitted).

[67] *Id.* (citation omitted).

[68] *Id.* (citations omitted).

[69] *Id.* at 233 (emphasis in original).

No. 22-30656

good-faith exception applies "where a warrantless search is authorized by statute or binding precedent later ruled unconstitutional[.]"[70]

## B.

"On appeal of a motion to suppress, legal conclusions are reviewed *de novo* while factual findings are reviewed for clear error[,]"[71] subject to harmless error.[72] The party seeking suppression "has the burden of proving, by a preponderance of evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights."[73] "Evidence is viewed in the light most favorable to the prevailing party."[74]

## C.

Defendants argue that the district court erred when it denied their motions to suppress evidence of CSLI—such as such as the location of the YMF members' phones at around the time of Womack's murder—which the Prosecution used to corroborate witness testimony. Their focus is upon the timeline of the Prosecution's 18 U.S.C. § 2703(d) applications in this case and the evolution of the constitutionality of warrantless compelled production under the Stored Communications Act:

- In October 2010, a magistrate judge in the Southern District of Texas held § 2703(d) orders to be unconstitutional.[75]

---

[70] *Id.*

[71] *Id.* at 231.

[72] *United States v. Garcia*, 99 F.4th 253, 266-67 (5th Cir. 2024).

[73] *Id.* at 267 (quotations and citation omitted).

[74] *Beverly*, 943 F.3d 225 at 231 (quotations and citation omitted).

[75] *In re U.S. for Hist. Cell Site Data*, 747 F. Supp. 2d 827 (S.D. Tex. 2010), *vacated*, 724 F.3d 600 (5th Cir. 2013).

- In November 2011, a district judge in the Southern District of Texas affirmed the magistrate judge's order.
- In December 2011, the Prosecution filed its notice of appeal to the Fifth Circuit.
- In August 2012, the Prosecution began its § 2703(d) applications in this case.
- In July 2013, the Fifth Circuit held that § 2703(d) was constitutional even as applied to the warrantless compelled disclosure of historical CSLI.[76]
- In June 2018, the Supreme Court overturned the Fifth Circuit's then-existing precedent with *Carpenter v. United States*,[77] which held, in relevant part, that compelled production ordered pursuant to § 2703(d) violated the Fourth Amendment by allowing the Government to obtain CSLI without a warrant supported by probable cause.[78]

The district court—over Defendants' objections—admitted the evidence because it found that the good-faith exception applied to CSLI obtained in this case pursuant to § 2703(d) orders that were sought after a lower court in a different district within the Fifth Circuit had found § 2703 orders to be unconstitutional, but before the Fifth Circuit's then-binding precedent in July 2013. We agree.

Under *Illinois v. Krull*, reliance on a statute is objectively reasonable "unless [the] statute is clearly unconstitutional[.]"[79] At the time of the Prosecution's § 2703(d) applications, the absence of binding precedent and the "uneven split of authority among district courts nationwide favoring constitutionality" did not meet the threshold of "clearly

---

[76] *In re U.S. for Hist. Cell Site Data*, 724 F.3d 600 (5th Cir. 2013).

[77] 585 U.S. 296 (2018).

[78] *Id*. at 316.

[79] 480 U.S. 340, 349 (1987).

unconstitutional[.]"[80] Moreover, the decisions of a federal district court are not controlling law for a different federal district court,[81] and do not render a statute "clearly unconstitutional."[82]

Defendants raise two additional arguments that are inapposite. First, they assert that the district court erred in holding that the Defendants bore the burden of proof on this issue. Though Defendants are correct in asserting that the Prosecution bears the burden of establishing objective good faith, this burden is distinct from the Defendants' separate burden of proving that their *Fourth Amendment rights* have been violated.[83] The district court correctly held that Defendants, not the Prosecution, bear this burden.

Second, Defendants argue that collateral estoppel prevented the Prosecution's reliance on the § 2703(d) orders. But it is well established that "nonmutual offensive collateral estoppel is not to be extended to the United States" because "the Government is not in a position identical to that of a private litigant" in "geographic breadth of government litigation and also … [in] the nature of the issues the government litigates."[84] Collateral estoppel does not apply here.

---

[80] *Id.*

[81] *See, e.g., Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 428 (2011).

[82] *Krull*, 480 U.S. at 349. This reasoning also undermines Defendants' related argument that the Prosecution acted in bad faith in failing to disclose adverse rulings in its §2703(d) applications: because the decision in the Southern District of Texas did not constitute legal authority in the Eastern District of Louisiana, the Prosecution did not have a duty to disclose such authority to the magistrate judges. *See* LA. PROF'L. CONDUCT R. 3.3(a)(2).

[83] *See Maggitt*, 778 F.2d at 1034; *Beverly*, 943 F.3d at 231.

[84] *United States v. Mendoza*, 464 U.S. 154, 158-59 (1984).

No. 22-30656

## V.

Defendants further assert that the district court abused its discretion in admitting phone records under FED. R. EVID. 902(11) and the Confrontation Clause. Neither argument prevails.

## A.

Rule 902 characterizes certain categories of evidence as "self-authenticating", or evidence that "require no extrinsic evidence of authenticity in order to be admitted[.]"[85] This includes certified domestic records of a regularly conducted activity, defined as: "[t]he original or a copy of a domestic record that meets the requirements of [the business records exception under Rule 803(6)(A)-(C).]"[86]

The Confrontation Clause of the Sixth Amendment "prohibits admitting out-of-court statements as evidence against defendants in a criminal case unless they can cross-examine the declarant. But that prohibition applies only if the statements are testimonial."[87]

## B.

This Court assesses the "admission of evidence pursuant to Rule 902(11) under an abuse of discretion standard[,]"[88] subject to harmless error.[89] "[R]eversible error occurs only when the admission of evidence

---

[85] FED. R. EVID. 902.

[86] *Id.* at 902(11).

[87] *United States v. Ayelotan*, 917 F.3d 394, 403 (5th Cir. 2019), *as revised* (Mar. 4, 2019) (quotations and citations omitted).

[88] *United States v. Olguin*, 643 F.3d 384, 390 (5th Cir. 2011).

[89] *Id.*

No. 22-30656

substantially affects the rights of a party."[90] This Court reviews challenges based on the Confrontation Clause *de novo*.[91]

## C.

The district court properly admitted the phone records under Rule 902(11). The phone records at issue included affidavits stating that Sprint, T-Mobile, and Charter created and maintained the relevant phone data as part of the ordinary course of a regularly conducted business activity. These affidavits, from records custodians and tracking the relevant language nearly word for word, satisfy Rule 803(6)'s requirements for admission.[92] Furthermore, as Defendants concede, the Prosecution followed proper procedures to admit the phone records.[93] Finally, Defendants' argument that the Prosecution was required to provide additional evidence to authenticate the phone records lacks merit: under this Court's caselaw, valid Rule 902(11) certificates are sufficient for admissibility.[94]

The admission of the phone records also does not violate the Confrontation Clause. The phone records here are not testimonial because they were created in the ordinary course of business, not "for the purpose of establishing or proving some fact at trial[.]"[95] And Defendants' argument that the certificates themselves violate the Confrontation Clause is

---

[90] *Id.* (cleaned up).

[91] *Id.* at 391.

[92] "[C]ertificates from a records custodian that track the language of Rule 803(6) nearly word for word render the records self-authenticating." *Ayelotan*, 917 F.3d at 402 (cleaned up).

[93] In a pretrial notice, the Prosecution specified the records it was seeking to admit under Rule 902(11), allowing defendants the opportunity to challenge their admission.

[94] *See United States v. Towns*, 718 F.3d 404, 410 (5th Cir. 2013).

[95] *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009).

No. 22-30656

unconvincing. As the Supreme Court has made clear, there is a distinction between a document "created for the sole purpose of providing evidence against a defendant" and a document created to "*authenticate* or provide a copy of an otherwise admissible record[.]"[96] While the former is testimonial and subject to confrontation, the latter—applicable here—is not.

## VI.

Defendants argue that the district court abused its discretion when it admitted Womack's statements under the forfeiture-by-wrongdoing exception because of its use of the "preponderance of the evidence" standard. This argument fails.

## A.

Prior to trial, the Prosecution filed a motion *in limine* to admit Womack's statements under FED. R. EVID. 804(b)(6). Following an evidentiary hearing, the district court ruled that by the forfeiture by wrongdoing exception to hearsay found in the Federal Rules of Evidence "all of Womack's statements on any topic can be introduced," subject to Rule 403 and 608 objections. At trial, the Prosecution elicited testimony from witnesses regarding things Womack had said to them.[97] Defendants challenge the admission of Womack's hearsay statements under the forfeiture by wrongdoing exception.

---

[96] *Id.* at 322-23 (emphasis in original).

[97] Milton Womack's attorney testified that Womack told him, "I've just been living under this for so long. I'm afraid. I'm tired. I want to get this over with, and I want some closure."

No. 22-30656

## B.

We review evidentiary rulings "for abuse of discretion, subject to the harmless error standard."[98] "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence."[99] Objections based in the Confrontation Clause are reviewed *de novo*, subject to harmless error.[100]

## C.

The Confrontation Clause states that: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with witnesses against him."[101] "The Amendment contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him."[102] The Confrontation Clause's goal—reliable evidence that passes through the crucible of cross-examination—is "a procedural rather than a substantive guarantee."[103]

Two exceptions exist to this constitutional guarantee; one is at issue in this case.[104] The doctrine of forfeiture by wrongdoing, allows "the introduction of statements of a witness who was 'detained' or 'kept away' by

---

[98] *United States v. Hankton*, 51 F.4th 578, 598 (5th Cir. 2022) (quoting *Gurrola*, 898 F.3d at 533 (5th Cir. 2018)). Here, this issue was preserved on appeal, and so the plain error standard does not apply. *United States v. Valas*, 822 F.3d 228, 240 (5th Cir. 2016).

[99] *Hankton*, 51 F.4th at 598 (quoting *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008) (internal quotation marks omitted)).

[100] *United States v. Acosta*, 475 F.3d 677, 680 (5th Cir. 2007).

[101] U.S. CONST. amend. VI.

[102] *Giles v. California*, 554 U.S. 353, 358 (2008).

[103] *Crawford v. Washington*, 541 U.S. 36, 61 (2004).

[104] *Giles*, 554 U.S. at 358-59.

the 'means or procurement' of the defendant[,]" and applies "only when the defendant engaged in conduct *designed* to prevent the witness from testifying."[105] The High Court has emphasized that, "[W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce."[106] Instead, "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation."[107]

The party seeking to admit the statement under Rule 804(b)(6) must demonstrate that Defendants "engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."[108] For Womack's statements to be admissible, Defendants must be found to have "ha[d] in mind the particular purpose of making the witness unavailable."[109] The High Court has reiterated that "the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds."[110] Thus, "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation."[111]

The Supreme Court expressly did not take a position on "the standards necessary to demonstrate such forfeiture, but federal courts using [Rule] 804(b)(6), which codified the forfeiture doctrine, have generally held the Prosecution to the preponderance-of-the-evidence standard."[112] Before the Federal Rules of Evidence were amended, the standard in the Fifth

---

[105] *Id.* at 359 (citations omitted).

[106] *Davis v. Washington*, 547 U.S. 813, 833 (2006).

[107] *Id.*

[108] *Giles*, 554 U.S. at 367 (quoting the Federal Rules of Evidence).

[109] *Id.* (citation omitted).

[110] *Davis*, 547 U.S. at 833 (citing *Crawford*, 541 U.S. at 62 (citation omitted)).

[111] *Id.*

[112] *Id.*

No. 22-30656

Circuit for forfeiture by wrongdoing analyses was clear and convincing evidence.[113]

Noting the ambiguity as to which standard should apply, the district court concluded that the Prosecution met their burden under both standards. The district court considered the numerous witnesses interviewed, the pending healthcare case, the timing of the killing with respect to Womack's guilty plea, cellphone records, the *Garcia* hearing specifics, and ballistics and forensic evidence recounted by Special Agent Williams. The district court was thorough in its investigation of the factual landscape and inerrant in its conclusions. It did not abuse its discretion.

## VII.

Defendants challenge the admission of Michael Fiser's testimony regarding attorney-client communications with Womack. Though attorney-client privilege survives death, we find that Defendants lack the requisite closeness for third-party standing.

## A.

Fiser represented Womack from July 6, 2012 until his death on July 27, 2012. Womack met with Fiser on July 11, 2012 and the pair met with investigators the next day. Fiser and Womack met with investigators one more time, on July 19. By July 25, the Prosecution and Womack had a plea agreement and announced Womack's intention to testify for the Prosecution. Two days later, Womack was murdered.

Following Womacks' death, the Prosecution opened a grand jury investigation into Womack's death and approached Fiser for information.

---

[113] *See United States v. Thevis*, 665 F.2d 616, 631 (5th Cir. 1982). One of our sister circuits—when presented with the question of which standard to apply post-amendment—found that the Federal Rules of Evidence had abrogated *Thevis*. *See United States v. Zlatogur*, 271 F.3d 1025, 1028 (11th Cir. 2001), *cert. denied*, 535 U.S. 946 (2002). The Eleventh Circuit adopts pre-creation Fifth Circuit caselaw as their own precedent. *Id.*

No. 22-30656

Fiser raised concerns about attorney-client privilege, and the Prosecution filed a motion to compel Fiser to disclose his communications with Womack. In January 2013, Judge James J. Brady heard the motion *in camera*, and at the hearing Fiser asserted the privilege on Womack's behalf.[114] Judge Brady ordered that Fiser was relieved of his attorney-client privilege and was allowed to share information with the Prosecution.[115]

Defendants challenge the admission of Fiser's testimony concerning communications Fiser had with Womack, asserting attorney-client privilege. They filed a pretrial motion *in limine*, and later a reply, seeking to exclude the testimony by Fiser that contained attorney-client communications. The district judge in this criminal case—Judge Barry W. Ashe—denied the contested motion *in limine* and ruled that "any communications Womack had with Fiser in the presence of a third party, including the Prosecution, are not privileged." The district court also determined that Fiser—not Defendants—possesses the right to assert the privilege.

Later, in September 2022, when the district court responded to Age Jr.'s motion for a new trial, the court denied the motion because Fiser's testimony did not implicate legal advice and the testimony was made in the presence of third parties, thus rendering the communication unprivileged. Even if there were privileged statements elicited at trial, the district court distinguished the Supreme Court's decision in *Swidler & Berlin v. United States* on two separate grounds.[116]

---

[114] *See supra* I(A)(1), which details Fiser's appointment as counsel.

[115] The Prosecution noted that the grand jury docket was under seal in the Middle District of Louisiana, and that Judge Brady had passed away. On March 14, 2022, however, Fiser filed a motion to unseal, and the Chief Judge of the district granted request for copies of the records be provided to Judge Ashe for *in camera* inspection.

[116] 524 U.S. 399 (1998). In *Swidler*, the Court held that the attorney-client privilege survives death but noted an exception for posthumous disclosure that "furthers the client's intent"—namely, the testamentary exception. *Id.* at 405-06. It also cited a great deal of older caselaw to establish this well-worn exception as stretching back far in time, and in

No. 22-30656

## B.

The district court's decision to admit Fiser's testimony at trial is reviewed for abuse of discretion subject to harmless error review.[117] The issue is whether Defendants possess the requisite third-party standing to assert Womack's attorney-client privilege. Defendants assert that the district court should have allowed them to raise Womack's attorney-client privilege regarding statements expressing fear of Defendants, statements made to third parties, and statements Womack intended to disclose to law enforcement.

"The question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."[118] The Supreme Court has recognized limits apart from the "minimum constitutional mandate" and that "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim on the legal rights or interests of third parties."[119]

---

caselaw. *See, e.g., Glover v. Patten*, 165 U.S. 394, 406-408 (1897) (holding that testamentary disclosure was allowed because privilege could be waived to fulfill client intent).

[117] *Yanez Sosa*, 513 F.3d 194, 201 (5th Cir. 2008). *See also, United States v. Mendoza-Medina*, 346 F.3d 121, 127 (5th Cir. 2003) ("Unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required.") (citation omitted).

[118] *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

[119] *Id.* at 499-500. "Without such limitations—closely related to Art. III concerns but essentially matters of judicial self-governance—the courts would be called upon to decide abstract questions of wide public significance even though . . . judicial intervention may be unnecessary to protect individual rights." *Id.* at 500. *See also, June Med. Servs., L.L.C. v. Russo*, 591 U.S. 299, 363 (2020) (Thomas, J., dissenting) (collecting prior caselaw on third-party standing).

No. 22-30656

Third-party standing allows a court to hear disputes where third parties assert—and thereby vindicate—the legal rights of others. The High Court noted that third-party standing exists when three criteria are satisfied: (1) an "injury in fact" which begets a "sufficiently concrete interest" in the outcome, (2) a close relation to the third party, and (3) some hindrance to the third party's ability to protect his or her own interests.[120] We find that, irrespective of an injury in fact, Defendants do not possess a close relation to Womack sufficient to assert his attorney-client privilege.[121]

The High Court has noted that the close relation prong is seen through the lens of whether the enjoyment of the right "is inextricably bound up with the activity the litigant wishes to pursue[,]" and the "relationship . . . between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter."[122] But, Womack was meeting with the Prosecution and had agreed to testify against Defendants—whose best interests were served by *not* having him testify against them in a federal criminal trial.[123]

Defendants both procured his absence and have attempted to "vindicate" his rights, yet also have a keen interest in suppressing any testimony from Womack. Defendants do not have a relationship such that

---

[120] *Powers v. Ohio*, 499 U.S. 400, 412-15 (1991).

[121] Defendants cite *Powers* for the contention that "there exists some hindrance to the third party's ability to protect his or her own interests." *Id.* at 410-11. To be clear, the *hindrance* is that Womack—after he expressed the clear intent of pleading and testifying and met with investigators—was *murdered*. His unlawful execution prevented him from testifying against certain Defendants and from asserting his own attorney-client privilege. Death is the insuperable obstacle here.

[122] *Singleton v. Wulff*, 428 U.S. 106, 114-15 (1976).

[123] *See also Rakas v. Illinois*, 439 U.S. 128 (1978) (affirming that Fourth Amendment rights are personal rights).

No. 22-30656

they are able to be an effective proponent, as their goals are diametrically opposed: Womack was in the process of testifying against Defendants. It was in their best interest that his testimony never reached the jurors' ears.

This Court in *United States v. Fortna* held that co-defendants in a case where one defendant's attorney-client privilege was violated by the Prosecution did *not* have standing to join the motion to quash.[124] Similar to Fourth Amendment rights, "Fifth and Sixth Amendment rights . . . are personal in nature and cannot be asserted vicariously."[125] Defendants have no standing to assert Womack's privilege. Their argument fails.

## VIII.

Defendants raise a multitude of complaints concerning the jailhouse informant Michael Crawford's adverse testimony. We deal with—and dismiss—each issue in turn.

## A.

Defendants argue that the district court erred when it allowed Crawford to testify at trial about statements Wilson made to him while they were both incarcerated under *Massiah v. United States*, arguing that Crawford *was* a government agent and deliberately elicited incriminating information from Wilson.[126]

---

[124] 796 F.2d 724, 732-33 (5th Cir. 1986). This case was cited by the Eighth Circuit for the same rationale: "In general, the attorney-client privilege is personal and cannot be asserted by anyone other than the client." *United States v. Hatcher*, 323 F.3d 666, 674 n.2 (8th Cir. 2003).

[125] *Fortna*, 796 F.2d at 733.

[126] 377 U.S. 201 (1964).

No. 22-30656

**1.**

Prior to trial, Defendants filed three motions challenging the admissibility of Michael Crawford's testimony: one alleging that he was a *Massiah* informant, one asserting that out-of-court statements by Wilson violated the other three Defendants' Confrontation Clause rights, and one arguing that Crawford's recounting of Wilson's statements did not meet any hearsay exceptions. The district court held a two-day evidentiary hearing and ruled that Crawford's testimony was admissible at trial.[127]

At the hearing, Crawford testified that he was friends with Wilson and that they would talk every night because they were incarcerated in the same part of the prison.[128] At some point, Crawford soured on Wilson and decided to approach the Prosecution with details he had learned from Wilson. Crawford had cooperated previously with the federal government and had received sentence reductions for doing so.[129] On January 14, 2020, Crawford urged his sister to reach out to the lead prosecutor in this case, and to tell her that he had information on Wilson. When he met with the case agent and the AUSA, Crawford was admonished by both not to ask Wilson any questions. About one week later, Crawford met with them a second time, and between

---

[127] Special Agent Williams and Crawford both testified at the hearing.

[128] The conversations range from gambling and sport, to rap, as well as life outside the prison's walls—including past criminal activity.

[129] He met with an Assistant United States Attorney ("AUSA") in June 2018 from the Eastern District of Louisiana, whom he contacted through his attorney in the hopes of providing information on another inmate. He also had a meeting with another AUSA concerning another inmate, whom he also wanted to provide information to the Government on.

40

No. 22-30656

the two meetings continued talking to Wilson. Crawford testified that he never specifically asked Wilson questions.[130]

**2.**

We review legal determinations *de novo* and factual findings for clear error,[131] while a claim grounded in *Massiah* is subject to harmless error analysis.[132] The "burden of establishing harmlessness beyond a reasonable doubt" lies with the Prosecution.[133]

**3.**

The Sixth Amendment's guarantee of counsel is found to apply in all criminal prosecutions—including all "critical stages of criminal proceedings"—which covers post-indictment interrogations by government agents.[134] *Massiah* established that cooperating government informants *can* be considered "[g]overnment agents."[135] While the Supreme Court has applied *Massiah* to a paid jailhouse informant who deliberately elicited incriminating statements from the defendant,[136] it has rejected a *Massiah* claim when a jailhouse informant listened to conversation and reported on what was said without making efforts to stimulate conversations about the crimes in question.[137]

---

[130] Crawford also testified that the information came out "in conversation[,]" and that Wilson just told him things.

[131] *Creel v. Johnson*, 162 F.3d 385, 392 (5th Cir. 1998).

[132] *Thompson v. Davis*, 916 F.3d 444, 454 (5th Cir. 2019).

[133] *United States v. Carrillo*, 660 F.3d 914, 926-27 (5th Cir. 2011) (citation omitted).

[134] *United States v. Pleitez*, 876 F.3d 150, 157 (5th Cir. 2017).

[135] *Massiah*, 377 U.S. at 206.

[136] *United States v. Henry*, 447 U.S. 264, 270-75 (1980).

[137] *Kuhlmann v. Wilson*, 477 U.S. 436, 456 (1986).

No. 22-30656

To establish a *Massiah* violation a defendant must show: "(1) a Sixth Amendment right to counsel has attached; (2) an individual seeking the information was a government agent acting without the defendant's counsel being present; and (3) that the agent deliberately elicited incriminating statements from the defendant."[138] Specific to jailhouse informants, the defendant must show: "the informant: (1) was promised, reasonably led to believe [that he would receive], or actually received a benefit in exchange for soliciting information from the defendant, and (2) acted pursuant to instruction from the State, or otherwise submitted to the State's control."[139]

Acting "in the hopes of" receiving a benefit is insufficient to establish a *Massiah* violation; affirmative enticement from the Government, however, does establish such a violation.[140] Timing is critical for determining whether the Government is controlling and steering the conversation.[141] "The Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached."[142] Crucially, "an informant cannot be an agent of the State without the State's knowledge or consent."[143]

---

[138] *Thompson*, 941 F.3d at 816 (5th Cir. 2019).

[139] *Id.*

[140] *United States v. Bates*, 850 F.3d 807 (5th Cir. 2017).

[141] *See, e.g., United States v. Fields*, 761 F.3d 443, 478 (5th Cir. 2014). In *Fields*, the informant in question pumped as much information out of the target as he could to pass that information on to the State. *Id.* The fact that Fields had been a government informant previously did not tilt the scales of the Court's analysis under *Massiah*. *Id. See also, United States v. Cutno*, 431 Fed. App'x. 275, 280 (5th Cir. 2011) (emphasizing the district court's finding of no evidence related to the informant "acting at the Government's behest at the time" of the confession).

[142] *Maine v. Moulton*, 474 U.S. 159, 176 (1985).

[143] *Thompson*, 941 F.3d at 816. The Court in *Thompson* cites to *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1296 (5th Cir. 1994) ("As in the formation of any contract, consent of both parties is necessary to establish an agency relationship."). In *Thompson*, the

No. 22-30656

When Crawford first met with the special agent and AUSA in this case, Crawford had been friends with Wilson for well over a year, and volunteered information concerning Wilson's involvement in the murder-for-hire plot. Crawford testified that, prior to this meeting, no one from the Prosecution had reached out to him about Wilson or any of the particulars of this case. The second time Crawford met with the Prosecution for this case— a week later—he testified that he "didn't deliberately get it[,]" but had new information, such as Wilson's son's name.

Defendants cite to Crawford on cross-examination, particularly his statements that after his sentencing, his lawyer told him that the Prosecution had said that they would always be amenable to information, and that Crawford *could* always come back to them.[144] But evidence of previous cooperation, as well as the hope of a future benefit, is not enough to qualify Crawford as a long-running government agent.[145] Defendants cite to two sister-circuit decisions to support their contention that Crawford was an agent, despite the lack of any kind of formal agreement or active direction.[146]

---

contact with the Government occurred after the information had been solicited. 941 F.3d at 817.

[144] Conditional language, such as could—and not should or must—imply a choice rather than an inexorable command for Crawford.

[145] *See Thompson*, 941 F.3d at 817.

[146] *See United State v. York*, 933 F.2d 1343, 1356-57 (7th Cir. 1991) (holding that a "prearrangement" makes the person in question a government agent); *United States v. Sampol*, 636 F.2d 621, 638 (D.C. Cir. 1980). The lack of Fifth Circuit caselaw, as well as the presence of the *Thompson* two-prong standard, rebuts these cases. Previous work as an informant, as well as the fact that Crawford—not the Prosecution—selected Wilson as someone to testify against cuts against Defendants' case. The simple fact that Crawford had testimony the Prosecution wanted to use does not mean that Crawford was acting as an agent. The absence of a continuous, established, and consistent quid pro quo type of relationship corrodes the conclusion that it was "prearranged" that he would automatically inform on anyone and everyone. In fact, informing in prison poses its own set of dangers and drawbacks, something Defendants do not acknowledge. Citing the relationship as

In addition, no affirmative language was used in any of the communications with the Prosecution following and during his sentencing that would qualify as "affirmative enticement"—simply stating Crawford knew he could inform on people, and leaving the door open to future instances, is not affirmative enticement, but rather "hopes" of leniency. We find that Crawford was not acting pursuant to State action or under State control.[147]

Under *Thompson*, Crawford would have to (a) be promised, (b) be reasonably led to believe that he would receive, or (c) actually receive a benefit in exchange for soliciting information from the defendant (here, Wilson).[148] First, there was no promise of a benefit from either the sentencing judge or the AUSA.[149] Second, he could not have been "reasonably led to believe" he would receive leniency when in multiple instances past leniency was denied or much less than desired. The possibility of a sentence reduction was present, but those well-acquainted with the prison system know of the

_____

"symbiotic" under other Circuit's precedent does not defeat the presence of adverse and controlling caselaw from this Court.

[147] The plea agreement that Crawford signed with the Government included portions about Crawford "immediately advis[ing]" the Government of someone breaking the law, submitting to Government interviews whenever requested, and appearing before any grand juries or juries to testify. While violation of the plea agreement could result in adverse consequences, no part of this agreement states that Crawford had to inform of *past* law-breaking—which is precisely what is at issue in this appeal. Submitting to interviews and testifying does not establish a per se principal-agent relationship, and telling the Government of current lawbreaking does not implicate informing on fellow inmates for past transgressions. In addition, the plea agreement does not establish an exchange of benefits between the Government and Crawford for agreeing to this.

[148] *Thompson*, 941 F.3d at 816 (5th Cir. 2019).

[149] Defendants cite to Crawford's testimony where he said the trial judge "promised" him a reduction if the Government filed for one. This, taken from Crawford's call to a friend, appears to paraphrase what the judge said. The belief that Crawford was guaranteed a reduction is equally inapplicable. In fact, he had tried to inform on three other inmates and had been disappointed when the Government had not given him what he wanted, or anything at all.

No. 22-30656

risks and rewards of becoming an informant. Finally, there was no material benefit exchanged between the Prosecution and Crawford. In fact, there was no instruction—and only admonishments—from the Prosecution not to elicit statements from Wilson. For the previous two years, Crawford and Wilson lived together, and "had a friendship[.]" The district court found that the details concerning the murder-for-hire plan accumulated over the course of Crawford's interactions with Wilson without the deployment of pointed questions, and that Crawford "asked only the kinds of questions persons typically pose in the course of ongoing, normal conversation."

We find no clear error. The voluminous transcript of the evidentiary hearing reveals a slow-growing relationship between two men who lived in close quarters for a long period of time. Defendants did not procure any evidence to the contrary: that they were not friends and did not live, gamble, and play cards together.

In addition, Defendants argue that Crawford engaged in the deliberate solicitation of statements from Wilson and cite to Crawford's admission that he asked questions in the normal course of conversation.[150] But the informant in a given case is not required to remain in stony silence to avoid the "deliberate eliciting" of information; no case in the Fifth Circuit commands absolute silence from an informant.[151] Supreme Court precedent on this issue stems from "action, beyond merely listening, that was designed deliberately to elicit incriminating remarks."[152] Crawford was not a government agent

---

[150] The district court had previously found that the questions Crawford asked in prison were the "kinds of questions persons typically pose in the course of an ongoing, normal conversation." This all, however, was before he spoke with the AUSA and case agent in the case on appeal, and so the information gathering does not automatically qualify as a *Massiah* violation.

[151] *McDonald v. Blackburn*, 806 F.2d 613, 618-22 (5th Cir. 1986) (ruling that the informant asking a question in the course of conversation was not automatically beyond mere listening).

[152] *Kuhlmann*, 477 U.S. at 459.

No. 22-30656

while his friendship with Wilson was secure, and there is no evidence that Crawford even "elicited as much information as he could . . . so that he could *then* pass that information to the [G]overnment."[153]

While the Sixth Amendment right to counsel attached in this situation, we conclude that Crawford was not acting as a government agent prior to his initial meeting with the Prosecution. After this meeting, Crawford did not deliberately elicit incriminating statements. Thus, under *de novo* review of the law, and plain error review of factual findings, we affirm the district court.[154]

**B.**

Defendants object to the district court's finding under the Confrontation Clause—namely, that Crawford's testimony is testimonial, and therefore their constitutional rights were violated. Defendants argue that the district court erred as a matter of law when it determined that the statements were non-testimonial and assert that the district court erred by not focusing on the primary purpose test to determine whether the statement was testimonial or not. We review violations of the Confrontation Clause *de novo*, subject to a harmless error analysis.[155]

**1.**

The Confrontation Clause "forbids the introduction of out-of-court 'testimonial' statements unless the witness is unavailable and the defendant

_____

[153] *Fields*, 761 F.3d at 478. As noted, the informant's actions in *Fields* did not trigger a *Massiah* violation. *Id.*

[154] Because of the multi-pronged failure on behalf of the Defendants' analysis, we decline to perform the harmless-error analysis. Given the sheer enormity of evidence presented at trial, however, any error would be harmless.

[155] *United States v. Noria*, 945 F.3d 847, 853 (5th Cir. 2019). *See also United States v. Polidore*, 690 F.3d 705, 710 (5th Cir. 2012).

has had a chance to cross-examine the witness previously."[156] The Clause "applies to witnesses against the accused—in other words, those who bear testimony."[157] Testimony, "in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact."[158] And, "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."[159]

The Supreme Court has developed a "primary purpose test" to determine whether a statement is testimonial in nature.[160] Statements are testimonial when they have "the primary purpose of establishing or proving past events potentially relevant to later criminal prosecution."[161] A court should also "look to all of the relevant circumstances."[162] The primary purpose test is a necessary, but not always sufficient, condition to the exclusion of out-of-court statements under the Confrontation Clause.[163] The

---

[156] *Samia v. United States*, 599 U.S. 2004, 2012 (2023). Only testimonial statements implicate the Confrontation Clause. *See Brown v. Epps*, 686 F.3d 281, 286 (5th Cir. 2012) ("[A] statement that is not testimonial cannot violate the Confrontation Clause."). *See also Noria*, 945 F.3d at 851 ("Importantly, only *testimonial* statements cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." (quotation marks omitted and emphasis in original.)); *Crawford*, 541 U.S. at 51 (2004) ("[N]ot all hearsay implicates the Sixth Amendment's core concerns.").

[157] *Crawford*, 541 U.S. at 51.

[158] *Id.* (citation and internal quotation marks omitted).

[159] *Id.*

[160] *Noria*, 945 F.3d at 851-52.

[161] *Bullcoming v. New Mexico*, 546 U.S. 647, 659 n.6 (2011) (internal alterations and quotation marks omitted) (quoting *Davis v. Washington*, 547 U.S. at 813, 822 (2006)). *See also Ohio v. Clark*, 576 U.S. 237, 245-46 (2015).

[162] *Michigan v. Bryant*, 562 U.S. 344, 369 (2011).

[163] *Clark*, 576 U.S. at 246. In fact, the Court recognized that the Clause does "not prohibit the introduction of out-of-court statements that would have been admissible in a

Confrontation Clause applies to persons other than law enforcement officers, and to private citizens such as Crawford.[164] To satisfy *Clark*, we examine "all relevant circumstances" concerning the situation between Crawford and Wilson "objectively[,]" including "the circumstances in which the encounter occurs and the statements and actions of the parties."[165]

The circumstances here are as follows: Wilson lived in close quarters with Crawford, and over time they developed a friendship independent of any Prosecution contact or direction. Wilson did not intend to incriminate himself in the upcoming trial, and over time told his friend Crawford about everything major in his life: family, sports, gambling, crimes, and their cases. Crawford had turned against multiple other inmates while incarcerated, taking information and handing it to the Government in other cases. There were two incidents that made Crawford dislike Wilson, with Crawford's

---

criminal case at the time of the founding." *Id.* (citing to *Giles*, 554 U.S. at 358-59 and *Crawford*, 541 U.S. at 56 n.6).

[164] *See* V(A) for why Crawford was not a government agent. Defendants assert that because *United States v. Vasquez*, a Fifth Circuit case from 2014, predates *Ohio v. Clark*, the Fifth Circuit did not establish precedent that survives *Clark*. They argue that, because the case in question concerned a *Bruton* challenge being analyzed on plain error due to novelty on appeal, that *Vasquez* could not possibly establish circuit precedent on the case. *Vasquez* is persuasive and clearly states the law—and the accord of our sister circuits on this issue. This Court in *Vasquez*, however, noted that the appellant asserted a Confrontation Clause claim, and cites to seven other circuit courts for the shared observation that the Supreme Court "described 'statements from one prisoner to another' as 'clearly nontestimonial' for the purposes of the *Crawford* analysis. . . ." 766 F.3d 373, 378-79 (5th Cir. 2014). An unpublished Fifth Circuit opinion post-*Clark* confirms this logic, citing this caselaw. *United States v. Rentfrow*, No. 23-60054, 2024 WL 707392, at *5 (5th Cir. Feb. 21, 2024) (reasoning that one defendant "recapping the attack" while in prison to another inmate did not qualify as testimonial under the primary purpose test).

[165] *Bryant*, 562 U.S. at 359. *Bryant* also cites to *Davis*, and how the Court in that decision used the word "objective" "no fewer than eight times" when describing the analysis, as well as the definitions for testimonial and nontestimonial statements. *Id.* at 360. That analysis also includes "statements and actions of both the declarant and interrogator[.]" *Id.* at 367.

sentencing hearing sandwiched between them. Furthermore, the bulk of the information that Crawford surrendered to the Prosecution was given at the first meeting, long after the relationship had been established.

Special Agent Williams testified that inmates in the penal system understand that information "would or could" lead to sentence reductions. We find that Defendants' assertion that the knowledge of sentence reduction recommendations is special and unique to prior informants, is unfounded in objective circumstances. What appears to have happened here is that an individual—who has a history of informing on even close friends—decided to bring forward information that he learned by virtue of living in close quarters with Wilson and, as such, the objective circumstances of his actions *at the time the information was gathered* would imply that the statements are nontestimonial.

## C.

All Defendants except Wilson object to Crawford's testimony as containing inadmissible hearsay. Crawford testified in court before the jury on the tenth day of trial—April 18, 2022. Defendants cite their objection to hearsay concerning conversations Crawford had with Wilson on April 25, 2022—on the fourteenth day of trial. In the pretrial order addressing the admissibility of Crawford's testimony, the district court ruled that hearsay objections had to be made "as they arise at trial."[166]

The Prosecution argues that because Defendants raised no objection during Crawford's trial testimony—but instead objected one week later—the objection was not preserved. Three full days of trial proceeded after

---

[166] The district judge reiterated this at trial the morning of Mr. Crawford's testimony, ruling that, "[j]ust like any defense witness, we will handle the objections to the testimony on a question-by-question basis."

Crawford's testimony and before Defense counsel's alleged objection.[167] Defendants deny a lack of preservation and cite no supporting caselaw. There were several hearsay objections to Crawford's testimony during his cross and direct examination. None, however, are an objection to the conversation at issue that Crawford had with Wilson where Crawford testified to Wilson saying that "they needed to whap old boy [Womack]."

**1.**

Properly preserved hearsay objections are reviewed for abuse of discretion, subject to a harmless error analysis.[168] Otherwise, plain error review applies on appeal.[169]

Under FED. R. EVID. 103(b), "[o]nce the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal." This Court has further held that when a district court *grants* a party's pretrial evidentiary objection,

---

[167] "Mr. Bourke: The other was, and I've spoken to the Government, we both feel like you ruled on Defense Motion 725 which was the hearsay exception for Michael Crawford, the statements against penal interest. But I can't find it anywhere in my notes, and I just wanted to make sure – my understanding is that you denied the motion once we got to trial. I just, you know.

The Court: Yes, yes. I think preliminarily and then based upon the way the testimony came in, the Court denied that motion.

Mr. Bourke: That was my understanding. I just wanted to, you know. I've got a job to do."

[168] *Yanez Sosa*, 513 F.3d at 199-201 (holding that "an abuse of discretion in admitting or excluding evidence is subject to harmless error review."). In addition, "[a] trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous statement of the evidence." *United States v. Ragsdale*, 426 F.3d 765, 775 (5th Cir. 2005) (citation omitted).

[169] *United States v. Avants*, 367 F.3d 433, 443 (5th Cir. 2004).

No. 22-30656

contemporaneous objections to contravening evidence are still required to avoid plain error review on appeal.[170]

Here, the district court ruled on the hearsay issues at stake on this appeal, that "any such objections will be addressed as they arise at trial." The district court did not grant or deny the motion *in limine*, but instead held that hearsay objections needed to arise at trial—and not be dealt with beforehand. Under Fifth Circuit precedent, "[e]videntiary objections must be specific."[171] They must also be "timely" under FED. R. EVID. 103(a)(1)(A).[172] Furthermore, objections must be lodged whenever the offending testimony is proffered.[173] Defendants failed to object to *any* of this alleged hearsay during direct or cross-examination.

The standard of "contemporaneous" objections at trial applies when there is a contravention of a pre-existing motion *in limine* and in the absence

---

[170] *United States v. Lara*, 23 F.4th 459, 475 (5th Cir. 2022) (adopting the reasoning of the Tenth Circuit and the Advisory Committee note to the 2000 Amendment to the Rules). Prior to the amendment of the Rules, parties had to make contemporaneous objections at trial *even if* they had made pretrial objections. *Id.* at 473-74. Black's Law Dictionary defines "contemporaneous" as "living, occurring, or existing at the same time". *Contemporaneous*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[171] *United States v. Avants*, 367 F.3d 433, 445-46 (5th Cir. 2004) (ruling that the lack of any objection violated specificity requirement of FED. R. EVID. 103). *See also, United States v. Polasek*, 162 F.3d 878, 883 (5th Cir. 1998) ("[A] trial . . . judge must be fully apprised of the grounds of an objection.").

[172] "Timely" is defined as being "within a specified deadline; in good time; seasonable". *Timely*, BLACK'S LAW DICTIONARY (11th ed. 2019). *See also Contemporaneous-objection Rule*, BLACK'S LAW DICTIONARY (7th ed. 1999) ("The doctrine that a proper objection to the admission of evidence must be made at trial for the issue of admissibility to be considered on appeal.").

[173] *See C.P. Ints., Inc. v. Cal. Pools, Inc.*, 238 F.3d 690, 696-97 (5th Cir. 2001) (reasoning that failing to object to four out of six instances of testimony on direct examination failed the requirements of Rule 103). *See also Bailey v. Southern Pac. Transp. Co.*, 613 F.2d 1385, 1389 (5th Cir. 1980) (holding that failing to object to the challenged evidence on four out of five occasions on which it was offered meant the issue was waived for appeal purposes).

No. 22-30656

of a definitive ruling.[174] Here, the days-later catch-all objection put forth by Defendants does not pass muster. The record speaks for itself; Defendants objected throughout Crawford's direct examination, but none of the objections concerned this hearsay issue. We review the inclusion of Crawford's relevant testimony for plain error.[175]

**2.**

The rule against hearsay "bars the admission of any 'statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'"[176] An admission by a party-opponent admitted against a defendant and his co-conspirators is not hearsay.[177]

Defendants implicitly acknowledge the party-opponent rule and object to Crawford's testimony as failing the FED. R. EVID. 804(b)(3)(B)

---

[174] *Lara*, 23 F.4th at 473-74. In addition, under FED. R. EVID. 103(d), the court "[t]o the extent practicable . . . must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means."

[175] *See also Puckett v. United States*, 556 U.S. 129, 134 (2009) ("If a litigant believes that an error has occurred (to his detriment) during a federal judicial proceeding, he must object in order to preserve the issue. If he fails to do so in a timely manner, his claim for relief from the error is forfeited."); *Yakus v. United States*, 321 U.S. 414, 444 (1944) ("No procedural principle is more familiar to this Court than that a . . . right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.").

[176] *Noria*, 945 F.3d at 852.

[177] *See* FED. R. EVID. 801(d)(2)(A) and (E). *See also United States v. Thompson*, 130 F.3d 676, 683 n.3 (5th Cir. 1997) ("Hearsay problems are not a concern if the jury believes that the defendant was one of the participants in the conversation; any statements he made would be admissible as a statement of a party opponent."); *United States v. Chaney*, 299 F. App'x 447, 452 (5th Cir. 2008) ("A statement is not hearsay if it is offered against a party and is the party's own statement.").

prong of statements against interest.[178] Such statements are excepted from hearsay because they are "so contrary to the declarant's proprietary or pecuniary interest . . . ."[179] Because the declarant is not testifying,[180] and the out-of-court statement cannot be tested in the crucible of cross-examination, courts have emphasized that the statements "must be corroborated by circumstances clearly indicating [their] trustworthiness."[181]

This Court has held that, "the term trustworthiness has two distinct elements. In order for a declaration against penal interest to be trustworthy evidence, the statement must actually have been made by the declarant, and it must afford a basis for believing the truth of the matter asserted."[182] The statements must "bear adequate 'indicia of reliability,' such that 'adversarial testing would be expected to add little, if anything, to the statements'

_____

[178] In pertinent part, Rule 804 holds that a statement qualifies if it "is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability."

[179] FED. R. EVID. 804(b)(3)(A).

[180] *See United States v. Young Bros. Inc.*, 728 F.2d 682, 690 (5th Cir. 1984) ("[I]t is clear that a witness who is unavailable because he has invoked the Fifth Amendment privilege against self-incrimination and was therefore unavailable under the terms of FED. R. EVID. 804(a)(1)").

[181] *United States v. Ebron*, 683 F.3d 105, 133 (5th Cir. 2012) (citation omitted). *Ebron* distinguishes that the declarant's statement was made to "a fellow inmate", and that "a statement made outside a custodial context does not provide the same set of incentives that create the risk of unreliable statement." The Court ultimately ruled that, given the uncertainty in the law—namely, the issue of non-self-inculpatory statements within a broader narrative of self-inculpatory statements—the district court did not abuse its discretion. *Id.* at 134.

[182] *United States v. Bagley*, 537 F.2d 162, 167 (5th Cir. 1976). This opinion explains how all the defense witnesses were prison inmates and how the Government attacked the credibility of every witness to show fabrication and contradiction. *Id.* at 167-68. The Court ruled that, "the trial judge reasonably could have concluded that the trustworthiness of the statement was not clearly indicated, and the judgment will be affirmed." *Id.* at 168.

reliability.'"[183] The "totality of the evidence" at trial in corroborating the statement is a key way to examine this entire situation.[184]

Defendants hammer at the untrustworthy character of Crawford and cite to his past criminal history and limited instances of informing on other inmates as evidence of his lack of credibility.[185] The Prosecution argues that Crawford, who was friends with Wilson, learned Wilson's side of the story through long months of living together in close quarters.

This Court has also noted that one important consideration is whether criminal liability is being foisted onto others.[186] Here, Crawford's statements implicate Wilson as the one who "orchestrated" the murder.[187] The trial record substantiates Crawford's testimony, from Jackson, Marigny, and Lewis' testimonies about Wilson and the other Defendants involvement to Ayanna's testimony about her brother's involvement in the conspiracy. We

---

[183] *United States v. Piper*, 912 F.3d 847, 856-57 (5th Cir. 2019) (citing *Lilly v. Virginia*, 527 U.S. 116, 125-25 (1999)). In *Piper*, the Court examined the entirety of the record and concluded that it was "not clear or obvious" that the statements were admissible. *Id.* at 857. Thus, under our precedent, to swing against the district court ruling, an edge case does not invalidate the testimony.

[184] *See United States v. Robinson*, 635 F.2d 363, 364 (5th Cir. 1981).

[185] They also note a number of slight inconsistencies between the *Massiah* hearing testimony, recorded phone calls from jail, and Crawford's trial testimony. This includes his effort to gain a reduction in his sentence. Any inconsistencies are details in a larger narrative where the main facts and vast majority of testimony from Crawford align with the entirety of the record. This includes who was caught with the murder weapon, the lack of immediate funds for the hit, and more.

[186] *Piper*, 912 F.3d at 857.

[187] Crawford also testified that Wilson showed Guillory and Age III where Nicholas' house was in the Gentilly neighborhood of New Orleans. The "totality of the evidence" at trial in corroborating the statement is a key to examining this situation.

No. 22-30656

see no error, much less plain error, on these facts—it is not clear or obvious that Crawford's testimony was inadmissible.[188]

**D.**

Defendants also object to strictures the district court imposed on the cross-examination of Crawford as violating their Sixth Amendment right of confrontation. In particular, Defendants challenge three distinct rulings regarding the exclusion of: (i) 1994 and 1995 state court convictions for a sex offense and an armed robbery offense under FED. R. EVID. 609, (ii) extrinsic evidence of prior inconsistent statements of jail calls between Crawford and his attorney under FED. R. EVID. 613, and (iii) evidence concerning whether another inmate and YMF member provided information to Crawford.

**1.**

Confrontation Clause violations are reviewed *de novo*, subject to a harmless error analysis.[189] Non-constitutional issues, however, are reviewed for abuse of discretion when errors arise on the limitation of a defendant's cross-examination.[190]

**2.**

The Supreme Court in *Davis v. Alaska* underscored "that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected rights of cross-examination."[191]

---

[188] Defendants also assert that Crawford perjured himself at trial—with no citation. We reject this argument.

[189] *See United States v. Jimenez*, 464 F.3d 555, 558-59 (5th Cir. 2006). *See also Delaware v. VanArsdall*, 475 U.S. 673, 679 (1986) (delineating the various factors necessary for harmless error analysis).

[190] *See United States v. El-Mezain*, 664 F.3d 467, 491 (5th Cir. 2011).

[191] 415 U.S. 308, 315 (1974) (internal quotation marks and citations omitted).

No. 22-30656

The cross-examination right gains even stronger salience when "the witness is critical to the prosecution's case."[192]

"While the scope of cross-examination is within the discretion of the trial judge, this discretionary authority to limit cross-examination comes into play only after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment."[193] The district courts wield "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or marginally relevant."[194] The Confrontation Clause is "generally satisfied when the defendant has been permitted to expose to the jury facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of witnesses."[195] The "relevant inquiry is whether the jury had sufficient information to appraise the bias and motive of the witness."[196]

"[W]hether the exclusion of evidence is of a constitutional dimension depends on the [district] court's reason for the exclusion and the effect of the

---

[192] *United States v. Mizell*, 88 F.3d 288, 293 (5th Cir. 1996).

[193] *United States v. Elliott*, 571 F.2d 880, 908 (5th Cir. 1978). It is well established that "discretionary authority comes about only after sufficient cross-examination has been granted to satisfy the Sixth Amendment." *United States v. Landerman*, 109 F.3d 1053, 1061 (5th Cir. 1997). We also reiterate that, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). *See also, Bigby v. Dretke*, 402 F.3d 551, 573 (5th Cir. 2005) ("[T]he Confrontation Clause does not guarantee defendants cross-examination to whatever extent they desire.").

[194] *VanArsdall*, 475 U.S. at 679.

[195] *United States v. Skelton*, 514 F.3d 433 (5th Cir. 2008) (internal citations omitted).

[196] *United States v. Tansley*, 986 F.2d 880, 886 (5th Cir. 1993).

56

exclusion."[197] This Court has noted that, "[t]his determination typically includes an inquiry into the admissibility of the evidence under the Federal Rules of Evidence."[198] For Confrontation Clause violations, the "defendant need not establish that the jury would have reached a different result."[199] Instead, the threshold question is whether, "[a] reasonable jury might have received a significantly different impression of [the witness'] credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination."[200]

In the Fifth Circuit, the right to cross-examine witnesses is "especially important" when the individuals "may have substantial reason to cooperate with the government."[201] While there is a "presumption in favor of free cross-examination, placing restrictions on its scope is within the sound discretion of the trial court."[202] Furthermore, "cross-examination into any motivation or incentive a witness may have for falsifying his testimony *must* be permitted."[203] The admissibility of bias evidence is still subject to FED. R. EVID. 403.[204]

---

[197] *Kittelson v. Dretke*, 426 F.3d 306, 319 (5th Cir. 2005).

[198] *Skelton*, 514 F.3d at 440.

[199] *Id.* The analysis centers "on the particular witness." *Id.*

[200] *VanArsdall*, 475 U.S. at 679-80.

[201] *United States v. Onori*, 535 F.2d 938, 945 (5th Cir. 1976).

[202] *Id.*

[203] *United States v. Bratton*, 875 F.2d 439, 443 (5th Cir. 1989) (citations omitted and emphasis in original).

[204] This Rule reads in its entirety: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

No. 22-30656

**i.**

The convictions at issue are a 1994 state court conviction for carnal knowledge of a juvenile and three 1994 and 1995 state court convictions for armed robberies.[205] Defendants explain that it was possible for the State of Louisiana to pursue duplicative charges against Crawford for past criminal acts for which he was serving federal time. At trial, however, defense counsel admitted that they had no indication that Crawford would be charged under Louisiana's laws. And the district court ruled that there was no indication that the state of Louisiana would charge Crawford or that there was any implication in his informant deal with the federal government that implicated the staying of any state charges.

Crawford's testimony at trial—on both direct and cross-examination—included the following: that he was convicted in 2005 for conspiracy to possess with intent to distribute five kilograms or more of cocaine; that he served a reduced sentence for that charge for 78 months; that he was serving a conviction on three counts of distribution and possession with intent to distribute heroin; that he was sentenced to 105 months and not 151-188 months; that he was a career offender; and that his sentence was reduced for informing on other inmates.

Under the dual sovereignty doctrine, prosecution is allowed for the same criminal conduct in federal and state court.[206] Here, under Louisiana law, the statute of limitations had not run on the 2018 heroin charges, and with a state conviction Crawford would have been eligible for life without

---

[205] Under FED. R. EVID. 609(b)(1), if more than ten years have elapsed since a witness' conviction or release form confinement—whichever is later—the evidence of said conviction is admissible only if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect . . . ." The Prosecution did not seek to exclude Crawford's 2006 federal conviction for conspiracy with intent to distribute five kilograms or more of cocaine, even though this was older than ten years as well.

[206] *See Gamble v. United States*, 587 U.S. 678, 707-710 (2019) (documenting and reaffirming the history of dual sovereignty and subsequent prosecutions).

parole. Defendants argue that the case at hand is similar to others presented to the Fifth Circuit over the course of years.[207] None are applicable.

In *Croucher*, the witness had a "lengthy history of both state and federal theft and burglary arrests, none of which, however, had resulted in conviction."[208] The witness admitted that he had been cooperating with both federal and state authorities as a result of dismissals.[209] While the witness testified that his "debt" had been worked off, this Court noted that his past actions were still liable under the statute of limitations, and law enforcement officials who he had been actively working with could indict or reindict him.[210] The district court—by allowing inquiry on only convictions involving moral turpitude and by disallowing inquiry for arrests occurring after the alleged conspiracy—left the jury "without any evidence that [the witness] was very vulnerable to pressures by the prosecution at the time he gave his testimony."[211]

Defendants argue that Crawford received favorable treatments in arrests, just as in *Croucher*. But Crawford's arrests were not subject to the special treatment seen in *Croucher*, nor was the state of Louisiana a party to his informant activities. Crawford was in federal jail on federal charges—and had only been informing to receive federal leniency. While the state of

---

[207] *See United States v. Croucher*, 532 F.2d 1042 (5th Cir. 1976); *Greene v. Wainwright*, 634 F.2d 272 (5th Cir. 1981); *Carrillo v. Perkins*, 732 F.2d 1165 (5th Cir. 1984); *United States v. Cooks*, 52 F.3d 101 (5th Cir. 1995); *United States v. Landerman*, 109 F.3d 1053; *Beaudine v. United States*, 368 F.2d 417 (5th Cir. 1966).

[208] 532 F.2d at 1044.

[209] *Id.*

[210] *Id.* at 1044-45. The Court also noted that he was charged for theft and burglary, and then the charges were dropped, after 1972. These two dates were prior to the termination of the alleged conspiracy in the case for which he was an informant, but before the corresponding indictment and trial.

[211] *Id.*

Louisiana *could* charge him for the same drug crimes, Defendants offered no evidence of such intent.

In *Greene*, the witness in question was the "chief" or "star" witness for the prosecution, and the district court granted a motion *in limine* that this Court described as a "complete bar" to exploratory inquiry into bias or motive.[212] Defendants emphasize *Greene* for the simple fact that no indictment or charge was pending against the witness.[213] This misses the mark; *Greene* focused on the complete bar of any cross-examination not concerning the criminal activity at hand. By contrast, Crawford expounded on many aspects of prison life and much of his criminal past—in addition to the criminal conspiracy at issue on the stand.

In *Carrillo*, the witness in question was vulnerable to prosecution on unadjudicated criminal offenses related to stolen firearms at the time of giving testimony at trial.[214] This Court ruled that the defendant's Sixth Amendment rights were violated because exploration could have revealed the witness' vulnerability to prosecution that would push him to compromise his credibility and to assist the State.[215] Defendants note that in *Carrillo*, the witness admitted he had committed a felony, denied a deal of working with the authorities, and knew charges could still be filed against him—just like Crawford. What Defendants fail to acknowledge, however, is that it was the *same* sovereign at issue in *Carillo*, that the charges were completely unadjudicated, and that the statute of limitations had not run. Crawford had

---

[212] 634 F.2d at 275.

[213] The scope of cross-examination stretched in and around the time of the testimony relevant to Defendants and did not resemble the "complete bar" present in *Greene*. Nor was Crawford the Prosecution's star witness in the weekslong trial. That award may go to Ayanna, who testified against her brother and father.

[214] 723 F.2d at 1167.

[215] *Id.* at 1169-70. In *Carillo*, it was a state charge that was unadjudicated, and a state criminal trial. Thus, the same sovereign was at play in both situations.

no contact with Louisiana, was not cooperating in the present case with Louisiana, and no contrary evidence was presented.

In *Cooks*, the witness was cooperating with both state and federal authorities, and the district court limited cross-examination to cover prior arrests and drug use and excluded information concerning a Louisiana arrest or future stiff penalties of conviction on either Texas or Louisiana charges.[216] Prior to cooperating with the Government, the witness was arrested in Texas for state drug offenses, and agreed to cooperate with state and federal authorities.[217] This Court ruled that the district court's limitation violated Cooks' Sixth Amendment rights, and that there was "obvious pressure" on the witness for his testimony to be valuable.[218]

Defendants contend that this is similar to Crawford because he *could* be prosecuted by Louisiana for drug charges and as a result *could* face severe penalties, inversely implying that the benefit of cooperating with the federal authorities would mean that Crawford would not face a "functional—if not actual—life sentence." This is a stretch, as no cooperation between Louisiana and the Prosecution of the kind present in *Cooks* was ever evinced at trial or before. And there was no unadjudicated conduct, as in *Cooks*, that had not been charged by any sovereign in Crawford's case.

In *Landerman*, the witness had a pending state charge that carried a potential life sentence when he entered into a plea agreement with the federal government.[219] The witness testified outside of the presence of the jury that, to his knowledge, no part of his deal would implicate his pending state

---

[216] 52 F.3d at 103-04.

[217] *Id.* at 102. The district court noted that in Texas, he would receive a possible 99-year sentence on the drug charges; in Louisiana, this would have been his third charge that would carry a possible 40-year sentence. *Id.* at 104.

[218] *Id.*

[219] 109 F.3d at 1061-62.

charge—leading this Court to conclude that the defendants' Sixth Amendment rights were violated.[220] Here, Defendants do not show or allege that there was *any* pending state charge, much less cooperation between state and federal authorities or promises of leniency.

Finally, in *Beaudine*, this Court noted that the witness was being cross-examined on the specifics of each felony in question "to test memory which, in many, many details, was hazy at best."[221] Here, the purpose of presenting Crawford's prior state convictions was decidedly not to test his memory. Rather, it was to show bias, and the possibility of a Louisiana prosecution that would carry a heavy sentence.

Crawford's situation differs from these cases as there were no pending charges in Louisiana and no evidence of any cooperation by the Prosecution with Louisiana authorities. We find that Defendants' Sixth Amendment protections were not violated, and that the district court's discretion allowed this restriction.[222] The distant and unproven specter of state charges does not implicate the Sixth Amendment under our precedent. We see no abuse of discretion by the district court.[223]

_____

[220] *Id.* at 1062-64.

[221] 368 F.2d at 421-22.

[222] The Government cites to FED. R. EVID. 609(b) as creating a presumption against admission of a conviction older than ten years. Under *Skelton*, "[t]his determination typically includes an inquiry into the admissibility of the evidence under the Federal Rules of Evidence." 514 F.3d at 440. Under FED. R. EVID. 609(b)(1), evidence of prior convictions is only admissible beyond ten years if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." In the present case, the evidence was cumulative that Crawford was a career offender, and Defendants were given wide latitude into the motivations of Crawford in testifying—namely, a hefty reduction.

[223] As reflected by trial transcripts and Government motions, the Prosecution viewed the carnal knowledge charge from 1994 as prejudicial and inflammatory to the jury. Given the stricture of Rule 609(b)(1), we also find that the district court did not abuse its discretion.

No. 22-30656

### ii.

At trial, the district court excluded recordings of jailhouse telephone calls between Crawford and his attorney—but allowed transcripts of the calls to be read into evidence.[224] During Crawford's cross-examination, defense counsel used these calls to impeach Crawford with prior inconsistent statements under FED. R. EVID. 613.

Defense counsel cross-examined Crawford on statements he made in telephone calls—and compared them to his testimony on direct examination. Defendants then moved to enter the recordings into evidence. The district court excluded the calls because defense counsel had not established an inconsistency, *and* the calls would have been cumulative of Crawford's testimony.

Defendants argue that Crawford took the "time-honored strategy" of testifying to not remembering the answer to a question asked. They argue that the district court misunderstood the state of current caselaw as it pertains to Rule 613.[225] Defendants also contend that acknowledging a statement—as opposed to hearing the "abject desperation" in Crawford's voice—violated the attorney's ability to "constitutionally confront" Crawford.[226]

---

[224] For context, the calls from prisoners are recorded, and each prisoner is assigned a unique seven-digit PIN that they use to dial outside numbers. This identifies who is (supposed) to be calling from the prison. Call transcripts and recordings were available to Defendants through the natural course of discovery proceedings.

[225] Defendants cite *United States v. Sisto* for the proposition that a witness' denial of a statement or failure to remember on cross-examination opens the door for the statements to be proven by another witness. 534 F.2d 616, 622 (5th Cir. 1976). In *Sisto*, there is no recording on hand—it was all live witnesses and non-documentary evidence. In the present case, there is an objective recording.

[226] This is an assertion without a single citation of secondary or primary authority.

No. 22-30656

Under our precedent, proof of a prior inconsistent statement is admissible to impeach a witness *and* proof may be elicited "by extrinsic evidence only if the witness on cross-examination denies having made the statement."[227] A witness' failure to remember does not constitute a denial.[228] Critically, "whether a claim of forgetfulness about a prior statement is genuine or feigned, and therefore consistent or inconsistent" is "a fact-specific inquiry" for the district court to conduct.[229]

At trial, Crawford never denied making a statement. Instead, he proffered variations on a theme of the fact that he did not remember phone calls from two years ago. As evidenced by the trial transcript, Crawford never denied making a statement, but rather testified that he had no memory of these specific phone calls. We see no abuse of discretion in the district court's ruling that the transcripts—and not the recordings—were proper tools of impeachment.[230]

### iii.

Defendants object to the district court's ruling on hearsay and relevance grounds pertaining to Defendants' desire to cross-examine Crawford about statements made to him by Tyrone Scott, a member of the YMF.

---

[227] *United States v. Devine*, 934 F.2d 1325, 1345 (5th Cir. 1991) (citing *Sisto*, 534 F.2d at 616). *See also United States v. Leslie*, 759 F.2d 366, 379-80 (5th Cir. 1985); *United States v. Hale*, 685 F.3d 522, 539 (5th Cir. 2012).

[228] *Devine*, 934 F.2d at 1345. *See also, United States v. Balliviero*, 708 F.2d 934, 939-40 (5th Cir. 1983) (holding that "[s]ince there is no denial that the statement was made, there is clearly no rationale for the introduction of a prior 'inconsistent' statement.").

[229] *United States v. Meza*, 701 F.3d 411, 427 (5th Cir. 2012).

[230] We also find that the district court was correct in its estimation that—under FED. R. EVID. 403—playing the calls would have been cumulative given that Crawford "readily adopted" statements in later phone calls that included similar content.

During the *Massiah* hearing and testimony conducted months prior to trial, defense counsel cross-examined Crawford on other inmates he served time with while at Nelson Coleman Correctional Facility. The Prosecution objected, and defense counsel explained that they wanted to elicit information about Scott. The Prosecution noted their prior agreement not to call Scott as a witness and told the district court that if the information was admitted, they would call Scott to the stand. Following the Prosecution's objections, the district court ruled that *Massiah* hearings do not have the same evidentiary rule strictures as trial, and thus statements from Crawford about what he heard from someone else other than Wilson were disallowed.

Even with this ruling from the district court, defense counsel could have asked Crawford other questions concerning Scott.[231] The district court did not impose a blanket ban on the topic of Scott, but only on statements he made to Crawford—not facts about him or his life that Crawford might have known. We find that the district court did not abuse its discretion and did not violate Defendants' Sixth Amendment rights.

## IX.

Age III challenges the district court's denial of his motions to sever his trial from his father's. We find no error.

## A.

Age III in his motion to sever argued that admitting a statement from his father against him would violate his Sixth Amendment Confrontation Clause rights.[232] The substance of the statement, alleged to be given to federal agents, was that, he, Age Jr., paid Age III to arrange Womack's

---

[231] Defense counsel pursued this line of questioning at the *Massiah* hearing but declined to do so at trial.

[232] His father had the right not to testify at the joint trial under the Fifth Amendment, meaning Age III would not be able to cross-examine him on this statement.

murder. We review the decision to deny a request to sever a joint trial under the "exceedingly deferential abuse of discretion standard."[233]

## B.

Under FED. R. CRIM P. 14(a), a district court may "order separate trials of counts, sever the defendants' trials, or provide any other relief justice requires." When a defendant argues that "the district court committed reversible error in denying his request to sever . . . [the defendant] faces a doubly high burden."[234] "'Severance is an *exception*' justified 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'"[235] "Particularly in conspiracy cases,"[236] federal courts "prefer joint[] trials of defendants who are properly charged in joint indictments."[237]

To overcome this "heavy presumption,"[238] "a defendant must show that the joint trial prejudiced him to such an extent that the district court could not provide adequate protection; and the prejudice outweighed the government's interest in economy of judicial administration."[239] There must

---

[233] *United States v. Ledezma-Cepeda*, 894 F.3d 686, 690 (5th Cir. 2018).

[234] *Id.* In addition, the Court went on to note that our precedent, "does not reflect a liberal attitude toward severance." *Id.* (internal quotation marks and citation omitted).

[235] *United States v. Daniel*, 933 F.3d 370, 380 (5th Cir. 2019) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

[236] *United States v. Musqiz*, 45 F.3d 927, 931 (5th Cir. 1995).

[237] *United States v. Daniels*, 281 F.3d 168, 177 (5th Cir. 2002) (noting the preference of federal courts for joint trials "[t]o promote judicial economy and the interests of justice . . . .").

[238] *Ledezma-Cepeda*, 894 F.3d at 690.

[239] *United States v. Snarr*, 704 F.3d 368, 396 (5th Cir. 2013).

be "specific compelling prejudice"[240] and not merely "generic allegations of prejudice."[241]

Age III argues that his situation overcomes the high hurdle of severability. The Prosecution responds that Age III may not have been indicted for the Medicare fraud case, but Ayanna's testimony put him squarely in the thick of the family business. The Prosecution's theory was that Age III and Wilson sought out a violent hit man to kill Womack to silence his testimony of multiple instances of criminal conduct, from Medicare fraud to school arson and insurance fraud. Age III points to the evidence of violence concerning Guillory and the similarity of his and his father's names as prejudicing him. But Age III does not explain how a separate trial would benefit him. This is apparent when his father would still be referred to as part of the conspiracy and Guillory and YMF-affiliated witnesses could still be called to testify, just as they were at trial.

The jury was instructed to apply evidence separately to each defendant. When it acquitted Age III of retaliation under Count Nine, the jury understood and applied their instructions. We "presume" that juries "follow the instructions given to them by the district court[,]"[242] and the acquittal of the retaliation charge is strong evidence that the jury understood and applied the law to the facts of this case.[243]

Here, four co-defendants are charged of being part of the *same* conspiracy, and of committing criminal acts in tandem at the *same* time.

---

[240] *United States v. Lewis*, 476 F.3d 369, 383 (5th Cir. 2013) (internal quotation marks and citation omitted).

[241] *Ledezma-Cepeda*, 894 F.3d at 690.

[242] *United States v. Owens*, 683 F.3d 93, 100 (5th Cir. 2012).

[243] *Id. See also, United States v. Stalnaker*, 571 F.3d 428, 435 (5th Cir. 2009) (noting that this behavior "suggests that the jury did not blindly convict on spillover evidence but instead gave each defendant and each count separate consideration.").

No. 22-30656

Given the facts, this is not a case fit for severance. We find no abuse of discretion by the district court.

## X.

Age Jr. challenges the district court's jury instructions for Count 9, charging conspiracy to retaliate against Ayanna, as erroneous.[244] We find no error in the jury instructions.

## A.

District court jury instructions are reviewed for abuse of discretion, "considering whether the instruction, taken as a whole, is a correct statement of the law *and* whether it clearly instructs the jurors as to the principles of law applicable to the factual issues confronting them."[245] This is subject to harmless error review.[246] In addition, the trial court is given "substantial latitude in describing the law to the jurors."[247]

A district court reversibly errs when it refuses to give a defendant's instruction "where (1) the requested instruction is substantially correct; (2) the requested issue is not substantially covered in the charge; and (3) the instruction concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense."[248]

---

[244] *See supra* I(A)(2) and II(E)(2).

[245] *United States v. Aldawsari*, 740 F.3d 1015, 1019 (5th Cir. 2014) (emphasis added and quotation marks omitted).

[246] *Id.*

[247] *Daniel*, 933 F.3d at 329 (citing *United States v. Ortiz-Mendez*, 634 F.3d 837, 839 (5th Cir. 2011) (internal quotation marks and citation omitted)).

[248] *Ortiz-Mendez*, 634 F.3d at 839.

## B.

Count Nine charges the conspiracy to retaliate against a witness for aiding law enforcement in the prior Medicare fraud case. Age Jr. argues that the jury should have been given a but-for causation instruction, reading as follows:

> "Intent of retaliating" has its natural meaning and refers to an action performed with the intention of returning like for like or getting revenge. *An action is taken with the intent of retaliating if it would not have been taken, but for the intention to retaliate.*[249]

Age Jr. asserts that but-for instructions are required for statutes using the phrases "because of," "results from," and "by reason of."[250] He argues that because 18 U.S.C. § 1513(f) criminalizes otherwise lawful activity, the statute implies that criminal or retaliatory intent's mere presence is not dispositive of guilt; the alternative would "criminalize [] thought."

The Prosecution notes that the finalized jury instruction reflected the Merriam-Webster's definition of "retaliation," which is, "to return like for like" and "to get revenge."[251] In *United States v. Maggitt*, two defendants were charged with witness tampering and witness retaliation under federal law.[252] "Generally, the natural probable consequences of an act may satisfactorily evidence the state of mind accompanying the act, even when a

---

[249] The proposed portion of the instructions are in italics.

[250] *Burrage v. United States*, 571 U.S. 204, 213-215 (2014).

[251] Black's Law Dictionary also defines "retaliation" as "the act of doing someone harm in return for actual or perceived injuries or wrongs" and "an instance of reprisal, requital, or revenge." *Retaliation*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[252] 784 F.2d 590, 592-93 (5th Cir. 1986). *Maggitt* deals directly with the statute at hand—unlike *Burrage*, which dealt specifically with a Controlled Substances Act statutory provision. *Id.*

particular mental attitude is a crucial element of the offense."[253] In addition, under 18 U.S.C. § 1513, "the Government need not establish an intent to carry out the threat; the only intent required is an intent to retaliate."[254] The *Maggitt* court noted that the jury could have concluded that the defendant lacked or possessed the requisite intent.[255]

Given the complete lack of caselaw support for but-for causation instructions with respect to witness retaliation, we see no abuse of discretion. Under the district court's jury instructions, the jurors were able to make inferences about the "natural probable consequences of an act" and did so at trial.[256]

## XI.

In their final attempt to overturn their convictions, Defendants allege violations of three discrete bodies of law: the Jury Selection and Service Act of 1968 ("JSSA")[257], the fair cross-section guarantee of the Sixth Amendment, and the due-process protections of the Fifth Amendment. Each claim implicates an attached legal standard and overall standard of review, addressed *infra* in turn.

Defendants' claims stem from the district court's denial of their motion to dismiss the indictment. They allege that the district court abused its discretion by declining to quash the grand jury indictment and failing to conduct an evidentiary hearing on their claims. To unpack the complex

---

[253] *Maggitt*, 784 F.2d at 593.

[254] *Id.* at 593-94 (referencing *United States v. Velasquez*, 772 F.2d 1348 (7th Cir. 1985)).

[255] *Id.* at 594.

[256] *See id.* at 593.

[257] This can be found at 28 U.S.C. §§ 1861-1878. *See also,* Walter Pettus Gewin, *The Jury Selection and Service Act: Implementation in the Fifth Circuit Court of Appeals*, 20 MERCER L. REV. 349 (1969).

claims at play in this issue, we divide the factual and legal landscape and resolve this thorny issue.[258]

## A.

To begin, Defendants moved to access documents pertaining to the grand jury that had returned their indictment.[259] The district court entered an order in favor of the defendants, granting access to a wide swath of information with names and addresses redacted.[260] The Clerk of Court for the Eastern District of Louisiana ("EDLA") in turn produced a multitude of documents that were entered into the record. Defendants moved to quash the indictment, alleging violations of the JSSA and the Sixth Amendment's fair cross-section guarantee.[261] Defendants also sought a full evidentiary hearing to prove the merit of their claims.

In an unforeseen twist, the Clerk of Court and her deputies retained counsel and sought to intervene in the dispute or to appear as amicus curiae in the case, an effort opposed by both the Prosecution and Defendants. The district court denied the Clerk's motion but permitted the Clerk to submit an expert report in conjunction with any accompanying statistical analysis. The

---

[258] "[D]ivide each of the difficulties . . . into as many parts as possible and as [i]s required in order to better resolve them." RENE DESCARTES, DISCOURSE ON METHOD AND MEDITATIONS ON FIRST PHILOSOPHY 11 (Donald A. Cass trans., Hackett Publ'g Co. 4th ed. 1998) (1637).

[259] More about what a master and qualified wheel, as well as the exact nature of the reports requested by Age Jr. and the other defendants will follow in XI(B).

[260] In addition to names and addresses, the district court ordered that dates of birth, occupations, juror identification numbers, and voting status information be redacted.

[261] Defense counsel supplemented their initial motion and analysis with another motion that alleged persons of lower economic status were also systematically excluded from the qualified lists, jury pools, and venires in EDLA.

No. 22-30656

district court also ordered the production of additional panel and venire data in machine-readable format.[262]

Upon receipt of the Clerk's expert report, Age Jr. filed a supplemental motion to quash the indictment, laying out his claims against the administration of the JSSA in EDLA. Defendants, with data in hand, filed a supplemental motion to quash and expanded on prior analysis with an additional expert report.[263] The Prosecution responded with its own expert report and disputed the findings and conclusions of Defendants' reports; Defendants replied.[264] The district court stated that only factual information from Defendant, Clerk, and Prosecution experts would be used. On June 2, 2021, the district court ruled that a prima facie case had not been established, and denied Age Jr.'s motion to quash. A later trio of motions filed by Age Jr. were also denied by the district court.[265]

_____

[262] This order was produced in response to a later motion by Age Jr. for machine-readable data, additional panels, and records produced from the review of EDLA jury selection processes by the Administrative Office of the United States Courts. The district court did not grant, however, the request from Age Jr. that the Clerk's office release the Jury Management Report or related working documents, reasoning that, "they are the internal, non-publicly available deliberative process and work product of that office and the Court finds that they are not reasonably required for movant's fair-cross-section challenge."

[263] One of the defense attorneys for Age Jr., Julia Chung, also submitted a sworn declaration and a few pages of statistical analysis on AO-12 forms received from judicial districts around the country.

[264] Defendants also moved for subpoenas to obtain the AO-12s from 41 district courts around the country that had not responded to their requests. This motion was deemed moot by the district court later.

[265] These motions asked the district court to summon individuals who failed to return juror qualification forms, to expand jury-selection records to include names and addresses, and to stay the proceedings due to systematic exclusion.

No. 22-30656

## B.

Under the JSSA, each United States district court must create and instantiate a written plan "for [the] random selection of grand and petit jurors that shall be designed to achieve the objectives of sections 1861 and 1862 of this title . . . ."[266] A plan becomes operational once it has been approved by members of the judicial council of the circuit in question, and the Chief Judge of the district (or their assigned delegate).[267] Here, the district in question is EDLA.

Under the Jury Selection Plan in place, the basic structure remains unchanged. The Clerk, who is charged with the overall supervision of the plan, is directed to use voter registration lists as the sole source from which to draw names. Periodic reports on the operation of the Jury Selection Plan are drafted by the Clerk whenever the Master Wheel is refilled or the Jury Selection Plan is amended. To obtain the voter registration list, the Jury Administrator in the Clerk's office reaches out to the Louisiana Secretary of State and requests an alphabetized voter registration list for the 13 parishes encompassed within EDLA.[268] Using this file, the Jury Administrator determines how many names are needed for the Master Wheel.[269]

---

[266] 28 U.S.C. § 1863. In relevant part, § 1862 forbids exclusion from jury duty on the basis of "race, color, religion, sex, national origin, or economic status." Meanwhile, § 1861 declares the policy of the JSSA that all litigants have the right to juries "selected at random from a fair cross section of the community in the district or division wherein the court convenes."

[267] *Id.*

[268] Although the briefs do not note this, and it does not appear elsewhere in the record, the role of Jury Administrator is separate from the Clerk of Court and is a member of the Clerk's office.

[269] For the period encompassing the criminal trial that is on appeal, the Jury Administrator determined that 60,000 names would be needed for the next four years. In addition, the names drawn from each parish are required to be "substantially in the same proportion" to the number of names on the voter registration lists. In essence, each parish

No. 22-30656

From there, the Clerk's Office uses an automated jury management system software to establish a "quotient"—the total number of names in the voter registration list divided by the number of names needed, rounded up to the nearest integer.[270] Once the quotient is calculated, the jury software is used to generate a random number from which the selection will begin on the source list. Names are then selected at the interval of the quotient, until the Master Wheel is completely filled. Every two years or so the Clerk's Office supplements the Master Wheel using the aforementioned methods.

Using the Master Wheel, the Clerk's Office then determines how many jurors the District needs based on the number and types of trials, and uses a computer program to extract the required number of potential jurors at random.[271] The Clerk's Office then sends juror qualification forms out to the chosen individuals, with instructions to sign and return the form through the mail—duly signed and sworn—*or* to fill out the form using the Court's website.[272] If the form contains an ambiguity, omission, or error, the Clerk's Office will return the form with instructions to add or correct, with an additional ten days to do so. In addition to the strictures of the plan, the Clerk's Office in EDLA also re-sends a second juror qualification form with stronger language and instructions to fill out the form.

Once received by the Clerk's Office, each form is reviewed to determine whether exemptions or excuses are triggered.[273] If an excuse or

---

must be represented "substantially in the same proportion" as they are in the voter registration list sent from the Secretary of State.

[270] According to the Clerk's letter, the calculation and documentation of the quotient is witnessed by members of the Clerk's Office.

[271] The program uses a National Institute of Standards and Technology random algorithm.

[272] Chosen individuals have ten days to do either one.

[273] Excuses range from being a full-time student to having served on a federal jury panel within the past two years. Exemptions include being a member of the Armed Forces

exemption is not applicable, any selected individual is expressly qualified to serve on a federal jury unless he or she meets one or more of the disqualifiers.[274] The Jury Selection Plan dictates that at least 300 names must be on the "qualified" wheel, although the Clerk maintained that around 2,000 qualified jurors are on the wheel at any given time.

As jury panels and pools are created over time, names are withdrawn from the qualified wheel and the qualified wheel is replenished continually. When requested by the district court, the Clerk's Office will begin summoning jurors from the qualified wheel using the jury management software to randomly select individuals in the wheel. Although procedures differ slightly for grand and petit jury pools and panels, the jury management software or the manual jury wheel (only for grand jury panels) is there at every interval, randomizing the process of choosing individuals.

In essence, a potential juror must not be excused, exempt, or disqualified—and must respond to the appropriate summons—as well as not be excused or excluded while in court on the day in question.

There have been two notable changes to EDLA's jury selection plans from January 10, 2013 to May 17, 2021: (1) the master jury wheel is refilled every two years (as opposed to four years previously) and (2) voter registration lists are supplemented with lists of licensed drivers and state identification cards.[275] The latter was changed by the district court not

---

of the United States, being a public officer in state or local government "actively engaged in the performance of official duties[,]" and more.

[274] Qualifications include the following: citizenship in the United States; being at least 18 years of age; residence in EDLA for at least one year; ability to read, write, or understand English to fill out the juror form; ability to speak English; capability of rendering satisfactory jury service; and no pending charges or convictions in state or federal court of crimes punishable by more than one year (unless civil rights have been restored).

[275] *See* E.D. La. Plan for Random Selection of Grand and Petit Jurors Pursuant to the Jury Selection and Service Act of 1968, effective May 18, 2021 ("Jury Selection Plan III").

because voter registration lists do not "represent a fair cross-section of the community in the district[,]" but rather plainly to "foster the statutory policy of 28 U.S.C. §§ 1861 and 1862 . . . ."[276]

## C.

We review challenges to the denial of an evidentiary hearing for abuse of discretion subject to harmless error.[277] An evidentiary hearing is required under our precedent when "the defendant alleges sufficient facts which, if proven, would justify relief."[278] Furthermore, we review constitutional claims *de novo*.[279]

## D.

Under both the Sixth Amendment of the U.S. Constitution and the JSSA, litigants are "entitled to have their grand and petit juries drawn from a fair cross-section of the community in the district or division where the court convenes."[280]

In *Duren v. Missouri*, the Supreme Court held that a defendant's Sixth Amendment right to a petit jury selected from a fair cross-section of the community was violated when jury wheels, pools of names, panels, or venires from which juries are chosen "systematically exclude distinctive groups in

---

[276] Jury Selection Plan III at 3.

[277] *See United States v. Gutierrez*, 343 F.3d 415, 421 (5th Cir. 2003) (citing *United States v. Linetsky*, 533 F.2d 192, 203 (5th Cir. 1976)).

[278] *Powell*, 343 F.3d at 362 (citing *United States v. Mergist*, 738 F.2d 645, 648 (5th Cir. 1984)). *Mergist* stands for the proposition that the error—even if present—if deemed harmless, renders the abuse of discretion moot.

[279] *United States v. Wills*, 40 F.4th 330, 335 (5th Cir. 2022).

[280] *United States v. Garcia*, 121 F.3d 704, 1997 WL 450169, at *3 (5th Cir. 1997) (citing *United States v. McKinney*, 53 F.3d 664, 670-71 (5th Cir. 1995)).

the community and thereby fail to be reasonably representative thereof."[281] *Duren* established a three-prong test, which is the prima facie threshold for a violation of the fair cross-section requirement.[282]

A defendant "must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."[283]

If the defendant succeeds in making this prima facie showing, then the Prosecution has the burden of "justify[ing] this infringement by showing attainment of a fair cross section to be incompatible with a significant state interest."[284] In addition, "a jury list drawn objectively, mechanically, and at random from the entire voting list of a [district] is entitled to the presumption that it is drawn from a source which is a fairly representative cross-section of the inhabitants of that jurisdiction."[285] To rebut this presumption, the defendant must prove that "the product of such a procedure is, in fact, constitutionally defective."[286] Intent to discriminate does not inhabit any part of the fair cross-section analysis.[287] Defendants argue that their Sixth Amendment fair cross-section guarantee is violated.

---

[281] 439 U.S. 357, 364 (1979) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)).

[282] *Id.* at 364.

[283] *Id.*

[284] *Id.* at 368.

[285] *Thompson v. Sheppard*, 490 F.2d 830, 833 (5th Cir. 1974).

[286] *Id.*

[287] *Duren*, 439 U.S. at 368 n.26. This is very different from an equal protection claim for discrimination, which requires a showing of purposeful or intentional discrimination. *See Castaneda v. Partida*, 430 U.S. 482 (1977).

No. 22-30656

**1.**

Defendants claim there are two distinctive groups under *Duren* for purposes of this analysis: African Americans and people of lower economic status. Defendants are correct that the former is "unquestionably a distinctive group in the community for Sixth Amendment purposes[,]"[288] a conclusion that the district court also agreed with.

The district court reasoned, however, that "persons of lower economic status[,]" which Defendants defined as households with an income of under $50,000 per year, do *not* satisfy the first prong of *Duren*. The district court noted that no other court had recognized this group for a fair cross-section challenge; that neither Administrative Office of the U.S. Courts nor the Clerk of Court had collected any data on this potential demographic; that the $50,000 dividing line was arbitrary and uninformative of actual economic status; and that race was used as a proxy for income by Defendants' experts.

We agree with the district court. The lack of data, supporting caselaw, and lack of discernible principle for a $50,000 cutoff for poverty in this judicial district means that the first prong of *Duren* was not met for this alleged group by Defendants.[289]

**2.**

The second prong of *Duren* focuses on "whether the representation of African Americans in the challenged venire was fair and reasonable in

---

[288] *McGinnis v. Johnson*, 181 F.3d 686, 689 (5th Cir. 1999) (quotation marks omitted).

[289] The $50,000 number seems to be derived from a U.S. Department of Housing and Urban Development dataset that a four-person family with $48,000 in yearly income in the New Orleans area in 2016 would qualify as a low-income household. There very well could have been a colorable claim, at least under the JSSA statutory standard—but, the data and logic Defendants advanced are inadequate to support this claim.

relation to the numbers of African Americans in the community."[290] The community in question for this analysis is the jury-eligible population in EDLA.[291] Defendants claim that the absolute disparity of 11.84%—along with other statistical data—satisfies *Duren*'s second prong.

*United States v. Maskeny* established the absolute disparity test in the Fifth Circuit for distinctive groups that are under 10% of the population.[292] Here, the court forms documented the population of African American citizens in EDLA as 31.1%. This is the *only* test used by the court to determine underrepresentation in this scenario.[293] Defendants spend many pages of their briefs and expert reports on other statistical methods and cite to *Berghuis v. Smith* for the proposition that the High Court has refused to select absolute disparity as the sole method of analysis.[294] What they fail to include, however, is that "neither *Duren* nor any other decision of this Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools."[295] Again, the proper test in the Fifth Circuit for distinctive groups that are not a "less-than-10%-minority" is absolute disparity.[296]

---

[290] *United States v. Williams*, 264 F.3d 561, 568 (5th Cir. 2001).

[291] *Id. See also, Garcia*, 1997 WL 450169, at *3 ("The distinctive group consists of the pool of individuals in that division who are eligible to serve as jurors and not the group's total population in the community."); *United States v. Fike*, 82 F.3d 1315, 1321 (5th Cir. 1996); *United States v. Yanez*, 136 F.3d 1329, 1998 WL 44544, at *1 (5th Cir. 1998) (holding that the gross voting age population in the relevant division was "not the proper base" and that the "jury-eligible population" should be used instead). *See supra* note 274 for delineation of what juror qualifications are in federal court.

[292] 609 F.2d 183, 189-90 (5th Cir. 1980). *See also, United States v. Butler*, 615 F.2d 685, 686 (5th Cir. 1980)

[293] *Mosley v. Dretke*, 370 F.3d at 479 n.5.

[294] 559 U.S. 314, 329-30 (2010).

[295] *Berghuis*, 559 U.S. at 329.

[296] *Maskeny*, 609 F.2d at 189-90.

No. 22-30656

The district court took note of the string of Fifth Circuit cases since *Duren* that have mapped out the contours of *Duren*'s second prong. Post-*Maskeny*, this Court held that absolute disparities below 10% did not make a prima facie showing of underrepresentation,[297] and in 2005, this Court found that an absolute disparity of 11.22% for an over-10% group did not satisfy the second prong of *Duren* because the disparity was not proven to be "more statistically significant than the 11% disparity which [the court] found insufficient to sustain a claim of racial discrimination in *Thompson v. Sheppard* . . . ."[298] Here, the district court adopted Defendants' datum of 11.84% disparity, but concluded that it was not statistically significant.[299]

In one regard, the able district court arguably misstated the law, albeit in favor of Defendants.[300] The Supreme Court in *Berghuis* noted that, "[a]bsolute disparity is determined by subtracting the percentage of African-Americans in the jury pool . . . from the percentage of African-Americans in the local, jury-eligible population."[301] The district court noted that 31.1% (the

_____

[297] *United States ex rel. Barksdale v. Blackburn*, 639 F.2d 1115, 1126-27 (5th Cir. 1981) (en banc).

[298] *United States v. Quiroz*, 137 F. App'x 667, 670 (5th Cir. 2005).

[299] One thing the district court noted is that the 11.84% exists as both a high-water mark and an inhabitant of the liminal space between discrimination and Sixth Amendment fair-cross-section challenges. In *Woodfox v. Cain*, this Court observed that the Supreme Court had found 14.7%, 18%, 19.7%, and 23% to satisfy Duren's second prong for grand jury discrimination cases. 772 F.3d 358, 375 (5th Cir. 2014). In *Mosley*, the Fifth Circuit found a prima facie discrimination showing with a 13.5% absolute disparity.

[300] Later in the order, however, the district court noted that the jury-eligible population was proper. Either way, the bulk of the analysis done by the district court uses the numbers Defendants proffer—which is a raw proportion of people over 18 years old derived from census data.

[301] *Berghuis*, 559 U.S. at 323 (internal quotation marks omitted). *See also, Garcia*, 1997 WL 450169, at *3 n.9 ("Absolute disparity measures the difference between the percentage of a distinctive group in a certain population and the percentage of that group in a subset of that population."). *Garcia* goes on to specify that in the jury selection context,

population number used by Defendants for African Americans) was for individuals that were over 18 years of age, and not the jury-eligible population. The district court was correct to observe that this number would be adjusted downwards because not all individuals over 18 are eligible for jury service, but all people eligible for jury service are over 18. We agree with the district court that this number was skewed higher than it should be for what must be an accurate analysis.

In addition, the district court—despite relying on the March 31, 2017 sample with the lowest possible yield of African Americans on the qualified wheel—noted that even at this high-water mark early in the qualification form collection process, the number still met precedential muster. Notwithstanding Defendants' imperfect statistics, *Duren*'s second prong was not satisfied. We affirm the district court on this finding.

### 3.

Defendants argue that *Duren*'s third prong was also satisfied. In *Duren*, the High Court explained that a jury-selection process "systematically excludes" jury-eligible individuals if the underrepresentation is "inherent in the particular jury process utilized."[302] Under our caselaw, the nature of the selection process and the length of time of the discrepancy must be considered—and the second prong is independent of the third prong.[303]

The data present in the expert reports, acknowledged by the district court, point to a differential rate of return for juror qualification forms with respect to different distinctive groups in EDLA. We find a recent D.C.

---

this means subtracting the percentage of a group on the jury wheel from the percentage of persons within that group who are eligible to serve as jurors. *Id.*

[302] 439 U.S. at 366.

[303] *See Paredes v. Quarterman*, 547 F.3d 281, 290 (5th Cir. 2009). *See also United States v. Weaver*, 267 F.3d 231, 241 (3d Cir. 2001).

Circuit opinion's reasoning persuasive. In *United States v. Smith*, our sister court succinctly states the nearly identical challenges concerning differential response rates and the subsequent call for increased enforcement from the Clerk's Office.[304] In short, "[defendant] allege[d] that Black residents respond to jury summonses at lower rates than other groups. Even if that is so, the resulting underrepresentation is not 'due to [Black residents'] systematic exclusion in the jury selection process.'"[305] The D.C. Circuit reasoned that the underrepresentation was "instead due to the independent choices of potential jurors—here, choices about whether to respond to a jury summons."[306] This "autonomous choice[]" is not inherent in the jury process.[307]

The D.C. Circuit distinguished this from *Duren*'s process, which gave women, but not men, certain opportunities to claim exemptions—and presumed women who failed to return juror forms claimed exemptions.[308] In *Duren* it was the system at work; here, the independent choices of potential jurors resulted in underrepresentation rather than the operation of the inherent exemption criteria.[309]

Similar to our case, the defendant in *Smith* put the onus on the Jury Office to enforce non-compliance of the JSSA. In *Smith*, the D.C. Circuit noted that evidence was lacking from the defendant concerning whether the Jury Office could remedy the disparity or if it would be reasonable to do so.[310] Here, logistical challenges would likely arise from the issuing of tens of

---

[304] *See* 108 F.4th 872 (D.C. Cir. 2024).

[305] *Id.* at 877-78 (quoting *Duren*, 439 U.S. at 366).

[306] *Id.*

[307] *Id.*

[308] *Id.*

[309] *Id.*

[310] *Smith*, 108 F.4th 878.

No. 22-30656

thousands of summonses, to the lack of resources, to the overworked district judges, to the mere fact that coerced jurors could very well be poor jurors.[311]

We find that Defendants fail to meet *Duren*'s third prong. The autonomous choices of individuals should not be imputed to the system.

### E.

"To show that the method of selecting jurors . . . is not in conformity with the requirements of the [JSSA]," Defendants must establish that there is a "substantial failure to comply with the Act's provisions."[312] The JSSA disallows exclusion from federal jury service "on account of race, color, religion, sex, national origin, or economic status[,]"[313] and demands that Defendants establish a substantial failure to comply with the Act's requirements.[314] Defendants make numerous allegations ranging from parish overrepresentation[315] to not using a source other than voter rolls.[316] We see no error in the district court's reasoning.

The district court denied the requested evidentiary hearing—and Defendants assert that this violated the JSSA, the Federal Rules of Evidence, and the Due Process Clause. Citing the JSSA's evidentiary

---

[311] *See United States v. Gometz*, 730 F.2d 475, 480 (7th Cir. 1984).

[312] *Garcia*, 1997 WL 450169, at *4. *See also,* 28 U.S.C. § 1867(a). "[T]he [JSSA] was enacted to provide a statutory remedy to realize the policy that all litigants in Federal Courts entitled to a trial by jury have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." *McKinney*, 53 F.3d at 670 (citing to 28 U.S.C. § 1861).

[313] 28 U.S.C. § 1862

[314] 28 U.S.C. § 1867(a).

[315] The random starting number was shown to be the cause behind this phenomenon, because whatever parish the iteration started on at random would lead to more individuals from that parish getting picked.

[316] Voter rolls have been deemed acceptable under the Constitution and the JSSA. *See, e.g.*, *Yanez*, 1998 WL 44544, at *2.

No. 22-30656

hearing provision, 28 U.S.C. § 1867(d), Defendants make a list of disagreements and inconsistencies they see in the district court's orders and motions, and allege that the district court did not accept their expert numbers as true. This is directly contradicted by a comparison of those reports' data points and the data used in the district court's motion to quash.

Defendants claim that they need to track down individuals who did not fill out juror qualification forms and interview them. This claim is frivolous. The information needed to make a prima facie case was provided by the Clerk's Office, and ranged from sex to race to parish information. The Jury Selection Plan does not envision the disclosure of grand jurors' names absent an order of the district judge working with the grand jury and with a showing of exceptional circumstances creating a demonstrated need for disclosure. *Test v. United States* gives litigants rights to inspect documents, but they are not boundless.[317]

Litigants are not allowed infinite exploratory resources and zero limitations.[318] Without stronger legal justification for the personal identification information—and concrete plans of contacting and interviewing these individuals—we find that the district court did not abuse its discretion by denying Defendants unfettered access to jury data.[319]

In addition, Defendants allege that their Due Process rights were infringed upon by the denial of an evidentiary hearing. For all intents and purposes, they received a *de facto* evidentiary hearing before a federal district court attentive to their concerns. Defendants submitted evidence, were given

---

[317] 420 U.S. 28, 30 (1975).

[318] *See United States v. Rice*, 489 F. Supp. 2d 1312, 1316-17 (S.D. Ala. 2007) (compiling cases on this issue).

[319] We also see no abuse of discretion in allowing the Clerk's Office to submit a small letter and factual report. They were not allowed to appear as an amicus or as an intervenor. *See also United States v. Hamdan*, 2021 WL 809376 (E.D. La. Mar. 3, 2021) (rejecting the Clerk's Office as an amicus).

exploratory power to collect data, and had their claims heard.[320] Under the *Mathews v. Eldridge* balancing test, Defendants' Due Process rights were more than satisfied.[321]

An indictment returned by a grand jury that was selected in violation of the Sixth Amendment fair cross-section guarantee must be quashed.[322] Defendants failed to make a prima facie case under *Duren*. We see no abuse of discretion in the district court's decision not to quash.

## XII.

We AFFIRM the able district court on all issues.

---

[320] Defendants cite to the Federal Rules of Evidence and expound upon the role of magistrate judges. Here, the district court ruled on their motion to quash.

[321] 424 U.S. 319, 335 (1976).

[322] *See Murphy v. Johnson*, 205 F.3d 809, 817-19 (5th Cir. 2000) (detailing Fifth Circuit and Supreme Court cases that hold that a tainted selection process subjects a conviction to attack under the Sixth Amendment).